## ATLANTIC COAST LINE R. CO. v. BALTI-MORE & O. R. CO.

### No. 2325.

District Court, D. Maryland.

Oct. 14, 1936.

Arthur W. Machen, Jr., H. Vernon Eney, and Armstrong, Machen & Allen, all of Baltimore, Md., for plaintiff.

Charles R. Webber and John J. Fitzpatrick, both of Baltimore, Md., for defendant.

CHESNUT, District Judge.

This case has now been submitted to the court for final decree on the merits, after five days of testimony and argument. In a former opinion in the case, (D.C.) 12 F.Supp. 711, on motion to dismiss the bill, questions as to jurisdiction (Note 1), limitations, and parties, were considered and decided in favor of the plaintiff.

By bill in equity the plaintiff is suing for an accounting and recovery of an equitable and just division of a joint rail rate for freight carried for the period of November 9, 1928, to November 22, 1930. The shipments involved citrus fruit from Florida via Atlantic Coast Line to Richmond, thence by Richmond, Fredericksburg & Potomac R. R. to Potomac Yards near Washington, D. C., and from there by Baltimore and Ohio Railroad to destination. As the delivering carrier, the B. & O. collected the freight due from the consignee and remitted to the Atlantic Coast Line a sum less than what is asserted by the latter to have been its fair and equitable division of the joint rate. This rate had been prescribed by the In-

Note 1: In support of the jurisdiction, see, also, Atlantic Coast Line R. R. Co. v. Pennsylvania R. R. Co. (D.C.Pa.) 12 F. Supp. 720; Id. (D.C.) 12 F.Supp. 726; Morgenthau, Director General, v. Sugar Land Ry. Co. (C.C.A. 5) 83 F.(2d) 72, 74.

terstate Commerce Commission in Case No. 16939 decided July 10, 1928, and the new rate made effective November 9, 1928, in a case entitled Railroad Commissioners of State of Florida v. Aberdeen & Rockfish Railroad Co., 144 I.C.C. 603.' Prior to this, joint through commodity rates on this traffic had been in force for many years and the divisions thereof had been made by the carriers by voluntary agreement. The new joint rates as prescribed by the Commission resulted in a reduction of about 2 per cent. in the old rates and, after the new rates became effective the northern and southern carriers, the Atlantic Coast Line being in the southern group and the B. & O. in the northern group, could not agree as to the basis of the division, with the result that on November 22, 1930, the southern carriers filed a petition with the Interstate Commerce Commission seeking an order for proper division thereof. This resulted in an order of the Commission made July 3, 1933, and modified January 8, 1934, fixing the basis of division between the northern and southern carriers for the future and ordering an adjustment in accordance therewith retroactive to the time of filing the complaint with the Commission as of November 22, 1930. Atlantic Coast Line R. Co. v. Arcade & Attica R. Corp., 194 I.C.C. 729; Id., 198 I. C.C. 375. The plaintiff and defendant here were parties to that proceeding. The northern carriers were dissatisfied with the result and thereafter filed a suit in equity against the United States under title 28 U.S.C.A. § 41 (28), and sections 44–46, to set aside and enjoin the enforcement of the order of the Commission. That suit, filed in the District Court of the United States for the Eastern District of Virginia, was heard and dismissed by a three-judge court with opinion reported in Baltimore & O. R. Co. v. U. S., 9 F.Supp. 181. An appeal taken by the plaintiffs was affirmed by the Supreme Court, May 18, 1936, in the case entitled Baltimore & Ohio Railroad Co. et al. v. United States of America et al., 298 U.S. 349, 56 S.Ct. 797, 80 L.Ed. 1209. In the opinion of the Court by Mr. Justice Butler, the history of the rates in question and the proceedings before the Commission were succinctly summarized and will be here repeated as a convenient explanation of the background to this case:

"The history and structure of the joint rates shed light on questions to be decided. June 25, 1908, the Commission found the rates, called 'gathering rates,' from places of shipment in Florida to junctions in the northern part of that state reasonable, but that the charges for transportation from the junctions to the north were unreasonable. It prescribed 'proportionals' which were added to the gathering rates to make joint rates applicable over through routes to destinations. Included in the proportionals were stated amounts, called 'specifics,' per box of estimated weight of 80 pounds to cover hauls beyond the gateways. These specifics went to the northern lines and constituted their share of the joint rates. [10]

"In 1915 the commission allowed the carriers in official territory a general rate increase of five per cent.[11] and in 1917 granted an additional 15 per cent. [12] These increases were applicable generally to interterritorial hauls. The specifics for northern lines were not advanced. In 1918, while the carriers were under federal control, the director general raised rates 25 per cent. The divisions to the southern and northern lines were increased by that ratio. In 1920, after the railroads were returned to their owners, the Commission granted to carriers in the southern group a general rate increase of 25 per cent. and to those in the eastern group, which included the northern lines here involved, an advance of 40 per cent. It also authorized charges for interterritorial hauls to be raised by 33⅓ per cent.[13] While that was enough to increase the southern carriers' shares by 25 per cent. and those of the northern lines by 40 per cent. in harmony with the respective rate increases, each group of carriers received divisions raised by 33⅓ per cent. The northern lines emphasize the fact that if their divisions had kept step with rates in that territory they would have been increased four times whereas in fact their divisions did not share at all in either of the first two advances and only partially in the fourth, i. e., 33⅓ instead of 40 per cent.

"The joint rates prescribed by the Commission's order of July 10, 1928, were spe-

---

[10] Florida Fruit & Vegetable Shippers' Protective Ass'n v. Atlantic Coast L. R. R. Co., 14 I.C.C. 476.

[11] The Five Per Cent Case, 31 I.C.C. 351; Id., 32 I.C.C. 325.

[12] The Fifteen Per Cent Case, 45 I.C.C. 303.

[13] Ex parte 74, 58 I.C.C. 220, 226.

cified amounts per 100 pounds. The assumed weight of 80 pounds per box to which were applied the specifics to cover hauls of the northern carriers was too low. While the Commission failed definitely to find actual average weight per box, its report distinctly indicates that it was about 90 pounds.[14] After the taking effect of the new rates the northern lines in trunk line and New England territories took, out of the freight charges they collected, and retained as their divisions per 100 pounds 25 per cent. more than the specific per box. The northern lines in central territory adopted 90 pounds as the basis on which to make conversion of the rate per box to rate per 100 pounds. The increase was slightly over 11.1 per cent.

"The divisions were not satisfactory to either group of carriers. November 22, 1930, the Atlantic Coast Line and other southern carriers filed their complaint[15] requesting the Commission to condemn the divisions of citrus fruit rates to trunk line and New England territories, then being received by them, as a violation of the requirements of section 1(4), of the act, 49 U. S.C.A. § 1(4) to prescribe just, reasonable, and equitable divisions in accordance with section 15(6), 49 U.S.C.A. § 15(6), and to require adjustment and refund to be made by northern lines in respect of transportation subsequent to the complaint. January 3, 1931, the Commission instituted a general investigation[16] in respect of divisions of joint interterritorial rates between official and southern territory. April 20, 1931, the northern lines filed a cross-complaint. To prevent duplication, the general investigation, so far as it concerned divisions of rates on citrus fruit in central territory, was set for hearing on the same record as the complaint of the southern lines in respect of divisions of rates to trunk line and New England territory.[17] Thus the issue concerning divisions of citrus fruit rates from Florida to destinations in official territory was segregated from the broader controversy. The order here assailed assigns to appellants divisions yielding more than did those accepted by them for a long time prior to the taking effect of the rate order of July 10, 1928."

The question on the merits now to be decided is what constituted a just and equitable division of these joint rates between the Atlantic Coast Line as the southern carrier and the Richmond, Fredericksburg & Potomac R. R. Co., and the Baltimore and Ohio Railroad Co., as the northern carriers, the gateway being Richmond, Virginia. As was pointed out in the former opinion in this case, 12 F.Supp. 711, it is not necessary in this case to determine the fair division as between the B. & O., and the R. F. & P. R. R. Co., because the B. & O. collected the whole freight charges from the consignee and remitted to the Atlantic Coast Line only such part as the B. & O. deemed proper. It is, therefore, legally immaterial in this case whether in the divisions made between the B. & O. and the R. F. & P. the latter has been overpaid or not as the plaintiff has not assented to the divisions as made. It is true that the plaintiff's bill also seeks a recovery from the defendant for traffic in citrus fruit where a part of the whole haul was over one or more southern carriers in addition to plaintiff's carriage; but, this being a relatively small amount, plaintiff's counsel at the trial waived this part of their claim (to avoid any question as to necessary parties in the case) leaving the case for decision only on that part of the whole traffic which was wholly carried by the Atlantic Coast Line as the southern carrier. This narrows and somewhat simplifies the matter for decision to the question of what is the fair proportion for the Atlantic Coast Line of the joint rates for the carriage of citrus fruit for the period mentioned from points in Florida to Richmond, Virginia, where connection was made with the R. F. & P., which carried the freight to Potomac Yards, near Washington, whence it was carried by the B. & O. to destination.

The question presented must be determined from the evidence in this case. Part of the facts of the case are covered by stipulation, and the main controversy is over the probative force of and weight to be given to the testimony of a number of witnesses for the parties respectively who have submitted rather elaborate statistics and other data in the form of exhibits; and over the effect to be given to the finding of the Commission as to the proper divisions for the period subsequent to November 22, 1930.

---

[14] Railroad Com'rs v. Aberdeen & Rockfish R. Co., 144 I.C.C. 603, at pages 615, 616, 626.

[15] Docket No. 24,069.

[16] Docket No. 24,160.

[17] Atlantic Coast Line R. Co. v. Arcade & Attica R. Corp 194 I.C.C. 729, at page 730.

As above pointed out, before the Commission's rate order of 1928, the joint rate on citrus fruit from Florida to points in "official territory" (which included destinations on the B. & O. in this case), was compounded from (1) a "gathering charge" or proportional from points of origin in Florida to Jacksonville as the gateway for the Atlantic Coast Line, plus (2) the proportional charge to destination which included (3) the "specifics" fixed by the northern carriers on their lines to destination. These specifics were stated as so many cents per box, estimated weight of 80 pounds, but shown for years to have been really about 90 pounds. The actual rate to northern points varied quite out of proportion to distances, those to water points (New York, Philadelphia and Baltimore), being depressed by water competition, and relatively much lower than to inland points, such as Altoona, Pennsylvania. To preserve the general level of the rate to New York, but to make more uniform rates to other points, in relation to mileage haul, the Commission adopted for the future approximately the "sixth class" rates which were about 40 per cent. of the "Constructive" first class rates to various destinations. The result of the rate order was to increase the joint rates to certain points, but to decrease them to others, with the result of an average net decrease of about 2 per cent. for all joint rates. The testimony shows that where joint rates are changed by a Commission order it is the very common practice of connecting carriers to share the increase or decrease in proportion to the former basis of divisions between them, that is, to adopt what is called a "revenue pro rate." And this had been done by the southern and northern carriers after the 1908 rate order which reduced existing joint rates north of the Florida gateway. The southern carriers proposed similar action after the 1928 rate order, but the northern carriers refused to assent. They took the position that they should continue to receive the same amount as their former "specifics" without reduction, but also insisted that the old specifics should be converted into new rates per 100 pounds by adding 25 per cent. thereto, the estimated weight of the box having been 80 pounds, although actually 90 pounds. Without circumlocution, what the northern carriers did was to increase their rates per box 12½ per cent. And it is perhaps significant that for destinations in "central territory" they inconsistently treated the same

box as having been 90 pounds, making no similar increase in the old "specifics." By making divisions on this basis the B. and O., for the northern carriers in the case, retained not only a *greater proportion* of the new joint rates than of the old rate, but also an *absolutely greater* sum by 12½ per cent. than had been retained out of the old rate which was reduced.

. The orders for new divisions made by the Commission in 1933 and 1934, retroactive to November 22, 1930, gave the northern carriers less than the basis insisted on by them but a greater proportion of the new joint rate than they had received of the old. The proportions between the southern and northern carriers as fixed by the orders was determined by the percentage relation of certain factors of distance for the respective line mileage hauls. The Commission ordered as follows:

"The so-called Florida arbitrary should be deducted from the rate and added to the share of the southern lines hereinafter determined. The remainder of the rate should be divided on 2-figure percentages, the percentage of the southern lines to be based on the factor in the scale of southern factors set forth in the appendix for the short line distance from point of origin to the gateway, and the percentage of the northern lines to be based on the factor in the scale of northern factors set forth in the appendix for the short line distance from the gateway to destination."

It was pointed out by Commissioner Eastman in his dissenting opinion, Atlantic Coast Line R. Co. v. Arcade & Attica R. Corp., 194 I.C.C. 761, that:

"The average hauls on this traffic are about 825 miles in the South and 375 miles in the North. For these distances the factors are 194 for the South and 60 for the North, or 0.235 per mile for the longer haul in the South and 0.160 per mile for the shorter haul in the North. The advantage per mile is 47 per cent. for the South."

In applying the scale of factors adopted by the Commission to the average mileage of the northern and southern carriers for the whole of the citrus fruit traffic in this case (854 miles for the southern and 207 for the northern) the factors are 200 for the south and 44 for the north, or 0.234 per mile for the south and 0.212 per mile for the north. The advantage per mile here for the south is only 10 per cent. By another calculation submitted by defendant, the percentage of the freight to be

retained for the northern carriers for the traffic in this case was 18 per cent. of the joint rate, as compared with 20 per cent. of the mileage haul, that is, about 90 per cent. of a mileage pro rate, which checks with the former calculation just above mentioned showing only a 10 per cent. advantage for the south. It is thus apparent that the application of the scale is substantially more favorable for the northern carriers in this case than for the average mileage for all the northern carriers affected by the Commission's Divisional Order. (Note 2).

We come now to a more particular consideration of the evidence in this case in connection with the facts stipulated. An analysis of the traffic involved in this case is comprehensively set out in Defendant's Exhibit No. 3, sheet 2. From this appears that the total number of carloads of citrus fruit was 3,656; that the total freight collected by the B. & O. was $1,184,635.41, which was divided by the B. & O. in the proportions of $957,543.71 to the south and $227,091.70 to the north; that the average revenue per car was $324.03; that the revenue per car mile based on average loading was 31¢; that the southern lines received 31.6¢ per car mile and the northern lines 28.8¢ per car mile (both figures estimated); and that the revenue per ton mile (estimated) was 18.7 mills, the northern lines receiving 17.4 and the southern 19. (Note 3.)

97 per cent. of the carloads were delivered at Philadelphia, Washington and Baltimore, the remainder being consigned to other points in Pennsylvania, Maryland and West Virginia. The percentage of the freight retained by the B. & O., for the northern carriers was approximately 18.9. Under the scale prescribed by the Commission's Divisional Order, the percentage would properly be about 18.

It is not disputed that the general burden of proof is on the plaintiff to show that the defendant has retained moneys that equitably it is required to pay over to the plaintiff. See Atlantic Coast Line R. R. Co. v. Florida, 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451. But the basic contention of the plaintiff is that the voluntary acceptance by the northern carriers for many years before November 9, 1928, of their specifics as their proportion of the joint rate is substantial prima facie evidence that the sum so accepted was fair and reasonable compensation for the transportation services performed (Williston on Contracts, vol. I, § 536, p. 1038; Robinson Const. Co. v. Barry, 135 Md. 275, 279, 108 A. 688), and shifts to the defendant the burden of showing that the northern carriers are fairly entitled to the larger sum they have retained, which burden it is contended has not been met by the defendant.

The plaintiff also relies on the evidentiary value of the Commission's report in the Divisions Case, Docket 24,069, and the orders therein made as to the basis of divisions as just and fair. This printed report of 33 pages (Atlantic Coast Line R. Co. v. Arcade & Attica R. Corp., 194 I.C. C. 729–762) presents a detailed and extensive consideration of transportation conditions relating to this traffic both historical and contemporary. The effect of the order based on the report has already been stated.

Plaintiff's Exhibit No. 4, the computations in which are not disputed, purports to show that out of the freight rates collected from consignees for the traffic in-

Note 2: The average mileage here referred to includes citrus fruit traffic moving over the A. C. L., and other southern carriers. While this latter traffic has been omitted from the accounting (on the ground of the parties) the plaintiff insists that it should be considered in determining whether or not the divisions prescribed by the Commission were fair. The defendant's counsel contends that if the average mileage were limited to the traffic moving over the A. C. L., as the only southern carrier, the applicable factors north and south would show an advantage for the south of 13.6%. As bearing on the fairness of the Commission's divisions, plaintiff's position is reasonable; but in any event the difference is not of controlling importance in view of the final result herein.

Note 3: The estimates made by the defendant are apparently based on an average of 828.9 miles of line haul for the A. C. L., and 215.4 miles for the northern carriers. The plaintiff contends that its average mileage (*on that portion of the traffic covered by this exhibit was* 846) and the weight of the evidence supports this, I think. In other calculations (based on all traffic involved in this case) the defendant has taken 207 miles as the average haul for the northern lines. The figures in this exhibit would of course to some extent be affected by these variations.

volved in this case (3,656 carloads), the B. & O. retained as the proportion claimed to be due to the northern carriers sums which were greater than just divisions in differing amounts dependent on the standard for the just division. These amounts are as follows:

1. On the basis of divisions as prescribed by the Interstate Commerce Commission in the Divisions Case, Docket 24,069, $11,760.96.

2. On the basis of giving the northern carriers the same amounts per box as before November 8, 1928, $26,060.92.

3. On the basis of giving the northern carriers the same amounts per box as before November 9, 1928, and in addition thereto the full amount of any increases in rates to various destinations allowed by the Interstate Commerce Commission in Docket 16939, $22,425.95, and

4. On the basis of a revenue pro rate, using as factors divisions in effect before November 9, 1928, $30,026.50.

By the defendant the contention is submitted that this court must entirely disregard the facts contained in the report of the Commission and the basis of divisions therein ordered as irrelevant to the issue in this case. In addition to this contention, testimony has been submitted by witnesses largely in exhibit form containing computations on various bases to support the proposition that the divisions as made by the B. & O., for the period in question, should be considered just and equitable. Thus it is pointed out with regard to this traffic that the weighted average distance of carriage in the north was 207 miles and in the south 854 miles; that is, approximately 20 per cent. of the mileage was in the north and 80 per cent. in the south; and that the amount retained by the northern carriers was only 18.9 per cent. of the total revenue. Thus it is said that on a mileage pro rate the percentage retained by the B. & O., for the northern carriers was less than their fair proportionate share despite the principle of rate making which sometimes prevails that revenues per mile decrease with increased distances.

Again, it is said by the defendant that the retained divisions now in dispute "are low in comparison with divisions reflecting (a) a rate pro rate, using local rates to and from the gateways or (b) reflecting 40% of first class rates to and from the gateways." And more elaborately with respect to exhibits the comparisons of divisions and costs based on system averages, with respect to both the total car mile basis and the gross ton mile basis are said to show relatively greater transportation costs in the north than in the south. These cost studies include all of the 3,656 cars involved in this case.

Another of the defendant's contentions based on its Exhibit No. 5, is that if the defendant had used its old specific rate to Washington, and added thereto merely the differences in rates to respective points of destination as fixed by the new rate order of 1928, the defendant would have obtained higher divisions than it actually employed. This latter contention may, I think, be dismissed simply by saying that it is illogical, being computed in part of an old rate and in part of a new.

The plaintiff attacks the probative weight of all these tests submitted by the defendant. It is pointed out that while entitled to fair consideration in the whole problem, they were in fact considered and found insufficient by the report of the Commission in view of other more weighty facts and considerations therein reviewed. I have independently considered this data as part of the evidence in this case. In general I accept as sound the views expressed by the Commission on the several points. In addition it may be said generally that while a just division of rates between connecting carriers for line mileage haul under the same conditions would fairly be in proportion to the mileage of each carrier, nevertheless it is not to be ignored that transportation conditions do vary greatly in different sections of the country. It could hardly be contended that an initial carrier whose line of haul was 100 miles over a flat plain would be fairly entitled to as much compensation per mile as that of a connecting carrier hauling freight over another hundred miles of mountain territory. Similarly, density of traffic consequent upon density of population is a factor for just and equitable consideration. And in this case it is clear that there is a much greater density of traffic in the north than in the south. Other differences in transportation conditions exist as between the northern and southern carriers here which it is unnecessary to discuss in detail. I therefore reject as a controlling basis of divisions both the line haul mileage and the rate pro rate test based on local rates north and south. Nor

do I find convincing the comparisons of divisions and costs based on system averages in view of their uncertainty. The averages themselves are obtained only as a result of elaborate computation based on certain assumptions. The insufficient probative force of such a computation on the car-mile basis, as tending to prove confiscation, was pointed out in the opinion of the District Court by Judge Soper, and by Mr. Justice Butler in the opinion for the Supreme Court in the case of the Baltimore & O. R. R. Co. v. United States, supra. It may probably be fairly said that the computation here has perhaps more relevancy and weight in determining just divisions than it had in proving confiscation. But nevertheless its necessary infirmities are such even on this issue that they deprive it of convincing force. On the whole I conclude from the weight of the evidence that the amount of the divisions retained by the defendant in this case for the northern carriers was *more than* fair, just and equitable. Clearly I think there is no warrant for increasing their rates by 12½ per cent. as they did, merely because the Commission stated the new rate in terms of weight per hundred pounds instead of as previously "weights per box estimated at 80 pounds." The action of the northern carriers in this respect seems to have been artificial and unreasonable.

The remaining question is how excessive were the divisions as made. This leads directly to a consideration of the four suggested bases of division set out in Plaintiff's Exhibit No. 4, and above enumerated. There is something to be said in support of each of these respective standards for determining just divisions in this case. It might reasonably have been expected that the northern and southern roads would have followed in this case the frequent practice of a revenue pro rate based on the divisions in effect prior to November 9, 1928, temporarily at least until a dissatisfied carrier had submitted the matter to the Interstate Commerce Commission, for decision for the future. It is true the northern carriers had previously expressed some dissatisfaction with the existing divisional basis for reasons heretofore indicated; but nevertheless for years they had voluntarily accepted those divisions and during the period had actively solicited the citrus fruit traffic and expended large sums for terminal facilities for that and other perishable commodities. While doubtless desiring a larger share of the joint rates they had nevertheless continued to accept their own specifics without petitioning the Commission for other divisions. Interstate railroad rate making and proper divisions thereof are so vastly complicated that it would seem only reasonable that connecting carriers should by agreement preserve the status quo inter sese until resort is had to the Commission. However, it is not disputed in this case that the northern carriers had the legal right to refuse continued assent to former divisions when applied to a reduced rate; nor indeed were they bound to continue voluntary consent to the same basis of division for the same joint rate but could apply to the Commission for revision thereof. I therefore do not find it equitable in this case to force upon them divisions based upon a revenue pro rate unless the evidence clearly requires that and, considering the testimony as a whole, I think it does not.

Perhaps there is an even stronger argument in favor of a division based on giving the northern carriers the same amounts per box as before November 9, 1928. This basis would continue the same absolute rates to them as prevailed before the rate reduction, in which they would not be required to share. And the argument of course is even stronger for the basis of divisions which would give the northern carriers the same amounts per box as before November 9, 1928, plus increases in the rates as made to certain destinations but without deduction for decreases in rates to other destinations. But on weighing the whole evidence I find it inequitable to apply either standard for the division in this case because the defendant's evidence, though not justifying the divisions as actually made by it, tends to show that the old divisions were unreasonably low for the northern carriers. It is necessary therefore to find from the whole evidence if possible some other standard for a just division.

█ This brings us to a consideration of the admissibility in evidence and weight to be given to the Commission's Divisional Order in Docket 24,069. And this is the most important single question in the case. As it here arises, it seems to be without precise precedent. As pointed out in the former opinion (12 F.Supp. 711) the situation with which we are here dealing results from the amendment of 1920 (section 418, 41 Stat. 486) to the Interstate Com-

merce Act whereby under section 15(6), 49 U.S.C.A. § 15(6) the Commission is given authority to fix just divisions for the future, but not for the past prior to the filing of a complaint by a dissatisfied carrier. Whether this limitation of the retroactive effect of the Commission's order for divisions when finally made (in a case such as this where a rate has been prescribed by the Commission but the divisions thereof have not been agreed upon by the carriers) was intentional or accidental does not appear from the legislative history. It results that as the Commission is given no jurisdiction with respect to divisions for the period of time here involved, the sole remedy is in the courts. Nevertheless in view of the nature of the subject matter, it seems clear on judicial authority that the remedy in the courts may not be invoked until after the Commission has acted. See particularly Terminal R. R. Ass'n of St. Louis v. United States, 266 U.S. 17, 30, 45 S.Ct. 5, 8, 69 L.Ed. 150; Backus-Brooks Co. v. Northern Pacific Ry. Co. (C.C.A.) 21 F.(2d) 4, 15; Great Northern Ry. Co. v. Merchants' Elevator Co., 259 U.S. 285, 291, 42 S.Ct. 477, 479, 66 L.Ed. 943; United States Navigation Co., Inc., v. Cunard S. S. Co., Ltd., 284 U.S. 474, 482, 52 S.Ct. 247, 249, 76 L.Ed. 408. Prior resort to the Commission "is required because the inquiry is essentially one of fact and of discretion in technical matters; and uniformity can be secured only if its determination is left to the commission. Moreover, that determination is reached ordinarily upon voluminous and conflicting evidence, for the adequate appreciation of which acquaintance with many intricate facts of transportation is indispensable, and such acquaintance is commonly to be found only in a body of experts." Great Northern Ry. Co. v. Merchants' Elevator Co., supra, 259 U.S. 285, at page 291, 42 S.Ct. 477, 479, 66 L.Ed. 943.

It is obvious that the purpose of the rule which delays the remedy in court until after the Commission has acted is to give the court the benefit of the Commission's report and findings in a highly specialized matter. It follows logically that the report and orders of the Commission constitute admissible evidence which the court is not only permitted but required to carefully consider in reaching its own independent conclusion on the subject matter. It seems to be equally clear, however, that as the Commission has no jurisdiction to determine divisions for the period here involved, its findings of fact are not conclusive even though supported by evidence and reached after due procedure. And possibly it may be said that they do not have even the force and weight to be given to them in a judicial proceeding where they are attacked as confiscatory. Nevertheless they fall in a category of highly persuasive if not controlling authority; or, as perhaps more accurately stated, they are entitled to great respect, as "the opinion of a body of experts upon matters within the range of their special knowledge and experience." Atlantic Coast Line R. Co. v. Florida, 295 U.S. 301, 317, 55 S.Ct. 713, 720, 79 L.Ed. 1451.

The defendant advances a number of objections to the Commission's report which go both to its admissibility at all and to its weight. In the first place, it is pointed out that the action of the Commission was legislative in nature dealing with the future and not judicial in character and dealing with the past. But this objection seems to be met by what was said in Great Northern Ry. Co. v. Merchants' Elevator Co., supra, 259 U.S. 285, at page 291, 42 S.Ct. 477, 479, 66 L.Ed. 943:

"Sometimes this is required because the function being exercised is in its nature administrative in contradistinction to judicial. But ordinarily the determining factor is not the character of the function, but the character of the controverted question and the nature of the enquiry necessary for its solution. To determine what rate, rule or practice shall be deemed reasonable for the future is a legislative or administrative function. To determine whether a shipper has in the past been wronged by the exaction of an unreasonable or discriminatory rate is a judicial function. Preliminary resort to the Commission is required alike in the two classes of cases."

Perhaps it may be said that the reasoning is more definitely applicable to the making of rates than to divisions but the difference is one of degree rather than of kind.

Again it is said that the decision of the Commission was influenced by considerations which are essentially legislative rather than judicial; with particular reference to the provisions of United States Code, title 49, § 15(6), 49 U.S.C.A. § 15(6) which directs the Commission to consider, among other things, the financial condition of the respective carriers; it being further said

that this element is not a proper subject for judicial consideration. And it is added that the latter consideration was given undue weight by the Commission in the particular case. It is to be noted, however, that by Interstate Commerce Act, § 1(4) (49 U.S.C.A. § 1(4) it is made the duty of common carriers "in case of joint rates, fares or charges, to establish just, reasonable and equitable divisions thereof as between the carriers subject to this chapter participating therein which shall not unduly prefer or prejudice any such participating carriers." Both sections 1(4) and 15(6) were enacted in the same statute, the Transportation Act of Feb. 28, 1920, §§ 400, 418, and should be read together. They were so referred to by Mr. Justice Butler in his opinion in Baltimore & O. R. R. Co. v. United States, supra, where he was describing the nature of the complaint of the southern carriers to the Commission as an alleged "violation of the requirements of section 1(4), of the act, 49 U.S.C.A. § 1(4) to prescribe just, reasonable, and equitable divisions in accordance with section 15 (6), 49 U.S.C.A. § 15(6), and to require adjustment and refund to be made by northern lines in respect of transportation subsequent to the complaint." These provisions of the Interstate Commerce Act show the settled policy of Congress to be solicitous for the integrity of the national transportation system, and it seems entirely too narrow to take the view that the courts in affording the remedy herein involved should be obliged to apply a standard of divisions materially inconsistent with the established public policy. True it is that in this case the court must form its own independent judgment of the weight of the evidence and is not necessarily bound by the Commission's decision. But objection such as this seems to go rather to the weight of the Commission's decision than to its admissibility in evidence as a guide to the court.

Another objection is of a different character. It is said the Commission's decision is not applicable because it covers a different period, that is, from November 22, 1930, and not prior thereto. In this respect the instant case seems also to be novel although it is not without analogy to Atlantic Coast Line R. Co. v. Florida, 295 U.S. 301, 317, 55 S.Ct. 713, 719, 79 L.Ed. 1451, where it was said:

"In thus holding we do not suggest that the determination of the Interstate Commerce Commission as to the rates to be operative thereafter had the force of *res judicata* in respect of past transactions. Cf. Arizona Grocery Co. v. Atchison, T. & S. F. Ry. Co., 284 U.S. 370, 389, 52 S.Ct. 183, 76 L.Ed. 348; State Corporation Commission v. Wichita Gas Co., 290 U.S. 561, 569, 54 S.Ct. 321, 78 L.Ed. 500. None the less, as the court below conceded, it was entitled to great respect, representing, as it did, the opinion of a body of experts upon matters within the range of their special knowledge and experience."

The evidence in this case does not establish the existence of any important difference in transportation conditions between the periods with which we are concerned here, November 9, 1928 to November 22, 1930, and the immediately subsequent period. In fact the traffic study which received the particular consideration of the Commission occurred in the period with which we are concerned. Certain minor changes are emphasized by the defendant, such as charges incident to reconsignment of cars and speeding up of traffic, but in view of the testimony as a whole, I find them relatively unimportant.

Again it is said that the Commission's decision was based upon a consideration of the traffic between numerous southern and northern lines as respective groups embracing a much greater area of transportation and number of carriers than are here involved. But again I find this consideration not important because the decision of the Commission included the defendant as a northern carrier; and perhaps even more importantly the effect of the decision is more favorable to the B. & O., with respect to the traffic here involved than to the average of all the northern traffic studied by the Commission.

On the case as a whole I find the divisions as fixed by the Commission fairly applicable and equitable for the basis of division to be applied in this case. The order of the Commission prescribing the divisions received very extended judicial consideration and was sustained against all attack. It is true the question was one of complexity and difficulty and there was not unanimity among the members of the Commission, but this consideration is unimportant as was pointed out by Mr. Justice Butler in his opinion in the case. It is not surprising that where facts are so complex and multitudinous, different minds do not reach exactly the same conclusion. Just

divisions as well as rate making is a highly difficult subject involving many different factors for adequate appraisal. Where due procedure is observed the nature of the subject matter is such that the deliberate determination by an administrative tribunal informed by experience of now nearly fifty years should properly be accorded great weight in the absence of some clear evidence that it is definitely erroneous. The problem for the judicial mind in a case of this character would seem to be to seek the best evidence that the case affords to determine a just and equitable division between the carriers. Weighing the evidence as a whole and giving due consideration to quality as well as quantity, I conclude that the basis of divisions as determined by the Commission is the most equitable for application in this case.

While uniformity in divisions is more important for the future than for the past, it would also seem desirable to preserve uniformity for the past as well as for the future where it can be done without injustice in any particular case. I am advised by counsel that cases similar to this and growing out of the same rate order of 1928, are pending between various southern and northern carriers, in the First, Second and Third Circuits. While each of these cases will, of course, be independently determined by the respective courts, it seems desirable in this first of the cases to be decided on the merits, to adopt if possible a standard for the divisions which may by reason of its fairness furnish the most likelihood of general acceptance. And while 'this consideration has not been made the basis of the decision, it seems to me to support the conclusion reached to apply as the standard the basis of divisions as fixed by the Commission. This will entitle the plaintiff here to a decree for $11,760.96.

The remaining question is with regard to the allowance of interest on this sum. In this character of case the allowance to the plaintiff is discretionary and not as a matter of right. Miller v. Robertson, 266 U.S. 243, 258, 45 S.Ct. 73, 78, 69 L.Ed. 265; Concordia Ins. Co. v. School District, 282 U.S. 545, 554, 51 S.Ct. 275, 278, 75 L.Ed. 528; Jones v. Foster, 70 F. (2d) 200, 206 (C.C.A.4); Carrington v. Basshor Co., 119 Md. 378, 382, 86 A. 1030; Jaeger v. Shea, 130 Md. 1, 7, 99 A. 954. It has been the practice of the Commission to include interest in reparation awards, and the practice has been approved by the Supreme Court. Louisville & N. R. R. Co. v. Sloss-Sheffield Co., 269 U.S. 217, 239, 46 S.Ct. 73, 81, 70 L.Ed. 242. And the Commission has allowed interest on the reparation award in the Divisions Case, Docket 24,069, 210 I.C.C. 66, 67. On consideration of the equities, I conclude that the plaintiff should be allowed interest on the excess divisions retained by the defendant from the dates the several portions thereof were respectively payable.

Counsel may submit a decree in accordance with this opinion. In the event of an appeal it may be that counsel will also desire more specific and detailed findings of fact to be made. If so, they may be submitted for consideration and action thereon, consistent with the principles and findings in this opinion.

