The **BALTIMORE AND OHIO RAIL-ROAD COMPANY** et al., Appellants,

v.

The **ALABAMA GREAT SOUTHERN RAILROAD COMPANY** et al.

No. 73-1017.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 30, 1974.

Decided Oct. 1, 1974.

Harry G. Silleck, Jr., New York City, with whom John L. Altieri, Jr., New York City, was on the brief, for appellants. Robert H. Huey, New York City, also entered an appearance for appellants.

Howard J. Trienens, Chicago, Ill., of the bar of the Supreme Court of Illinois, pro hac vice, by special leave of Court, with whom Richard J. Flynn, Chicago, Ill., was on the brief, for appellees, Southern Railroads.

Carl E. Sanders, Augusta, Ga., of the bar of the Supreme Court of Georgia, pro hac vice, by special leave of court, with whom Jay W. Freedman, Washington, D. C., was on the brief, for intervenors.

Before LEVENTHAL, MacKINNON and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

This case concerns intricacies of the Interstate Commerce Act and the relationship of the Act to the common law and judicial equitable discretion. The precise question is whether this court should order a retroactive readjustment of divisions of agreed joint rates. We agree, although for somewhat different reasons, with the District Judge that this question should be answered in the negative.

## I. THE NORTH-SOUTH DISPUTE

At issue in this case is the proper division of joint rates on freight shipped between North[1] and South. When freight is shipped between the two regions, a single (joint) rate is charged. This rate is divided between the northern and southern railroads involved, according to the prescribed "division." This allows the railroads better to coordinate their freight service.

Since 1953 the division between the northern railroads, such as the Baltimore & Ohio, and the southern railroads, such as the Alabama Great Southern, has been set on an equal-factor basis.[2] Hence, the relative share of the joint rate is the same as the relative share covered by each railroad of the total mileage which an item is shipped. If freight is shipped an equal distance on northern and southern lines, the two share equally in the joint rate charged.

In 1956, eighteen years ago, the northern railroads requested the ICC grant them higher divisions than the ratio under the equal-factor scheme, because of their belief that their costs had increased relative to the southern railroads' costs. After nine years, the ICC granted a new division, giving the northern lines an increase in their

---

1. As used in this opinion, North refers to the northeast quadrant of the United States, and South refers to the southeast quadrant.

2. Official-Southern Divisions, 287 I.C.C. 497, 289 I.C.C. 4 (1953). Prior to 1953 the southern railroads received higher divisions than the northern roads, due in part to

higher costs at the time. Divisions of Rates, Official and Southern Territories, 234 I.C.C. 175 (1939). The Supreme Court, however, found the entire rate system discriminatory against the South in New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947).

share.[3] This ICC decision was based largely on its finding of increased territorial average costs on all traffic in the North vis-a-vis the South. On review of the ICC order, however, the Supreme Court affirmed a lower court finding that there was no substantial evidence that territorial average costs were the same as comparative costs of North-South traffic,[4] and the case was thereafter remanded to the ICC for further hearings.[5]

The ICC issued a new order in 1970,[6] which was set aside by a three-judge federal district court in Louisiana.[7] After remand to the ICC, the proceedings were dismissed (without prejudice) by the ICC in 1971, on the grounds that the record was stale, as it was based upon evidence of costs in 1956–59.[8]

The northern railroads began anew in 1972, and once more requested that the ICC change the division so as to increase their share.[9] Recognizing that the ICC could only change divisions *for the future*,[10] the northern railroads brought suit in U.S. District Court to obtain a *retroactive* readjustment of divisions. Considering the 16 years which by then had elapsed since the northern railroads brought their complaint against discriminatory divisions to the ICC, their desire to get into court with a prayer for retroactive, or at least contemporary, relief is understandable. As is made clear below, our difficulty is not incompassion with the equities of appellants' plight, but a deference to the clear statutory intent plus discernible counter-vailing equities. In particular the northern railroads sought damages for the southern railroads' "violations of their statutory and common law duties to maintain reasonable divisions *during the period of the pending administrative proceeding*." [11] The northern lines additionally suggested that determination of the reasonableness of the division during the pendency of administrative proceedings be referred to the ICC, under a primary jurisdiction theory.

The southern railroads filed an answer and a motion for summary judgment seeking dismissal for failure to state a claim upon which relief can be granted. The District Court ordered dismissal of the complaint, on the ground that section 15(6) of the Interstate Commerce Act prohibits the courts as well as the ICC from awarding retroactive changes in divisions where joint rates are agreed on by the parties rather than imposed by the ICC.[12] We affirm the dismissal for the reasons hereinafter explored.

## II.  THE  UNDERLYING  LEGAL  FRAMEWORK

The Interstate Commerce Act deals specifically with the question of divisions of joint freight rates in section 15(6).[13] In pertinent part this section provides:

> Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or

---

3. Official-Southern Divisions, 325 I.C.C. 1, modified, 325 I.C.C. 449 (1965).

4. Baltimore & Ohio R.R. v. Aberdeen & Rockfish R.R., 393 U.S. 87, 91, 89 S.Ct. 280, 21 L.Ed.2d 219 (1968), aff'g and modifying Aberdeen & Rockfish R.R. v. United States, 270 F.Supp. 695 (E.D.La.1967).

5. Order of three-judge court, E.D.La., reprinted in Brief for Appellees at A–5.

6. Official-Southern Divisions, 337 I.C.C. 74 (1970).

7. Unpublished order.

8. ICC Orders 29885, 29799, reprinted in Appendix at 6–a.

9. ICC Docket No. 35585.

10. *See* text at note 13 *infra*.

11. Brief for Appellants at 10 (emphasis supplied). The complaint filed by the northern railroads sought relief as of 1 January 1972, whereas the proceeding before the ICC was not commenced until 17 March 1972. No reason has been given for the change of date for starting to compute relief requested in the northern railroads' brief before this court.

12. 350 F.Supp. 719 (D.D.C.1972).

13. 49 U.S.C. § 15(6).

charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission and the divisions thereof are found by it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the Commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable, and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith.

Thus, section 15(6) gives the ICC the power to change divisions of joint rates when it finds them to have been unreasonable. If the joint rates were established pursuant to an ICC order, then the change of divisions may be effective as of the date of the filing of the complaint or the date of the ICC order of investigation. But if the joint rates were not established by the ICC, *i. e.*, were *agreed* rates, then the ICC can only order a *prospective* change of divisions.

■ In the case at bar, it is conceded that the rates are agreed rates,[14] and the ICC itself cannot order a retroactive change of divisions. The question is whether the courts can or should award retroactive relief from allegedly unrea-

sonable divisions, when the ICC is prohibited from so doing by statute.

The Supreme Court explored the scope of section 15(6) in 1928 in Brimstone R.R. v. United States.[15] The Court noted "the studied purpose [of Congress] to grant no power to require readjustments of past receipts from agreed joint rates." [16] In the Court's view, railroads might assent to rates only because of the divisions made; allowing retroactive revision of the division would destroy the basis on which the agreement was made. Since the power retroactively to change divisions is so enormous, the Court felt it important carefully to preserve the distinction drawn by Congress between agreed and ICC-established rates.

The *Brimstone* case and section 15(6) deal explicitly only with the power of the ICC; *Brimstone* as binding authority could easily be distinguished from the instant case where the court's power is sought to be invoked. However, we believe that the principles inherent in the *Brimstone* opinion are equally applicable in the current proceeding.

## III. APPLICATION TO THE NORTH-SOUTH DISPUTE

### A. *Brimstone and Section 15(6)*

Railroads often agree among themselves to establish joint rates. Behind the agreement lies an expectation of each railroad as to the division it will receive. Railroads would be hesitant to agree to low joint rates if they thought their division might be reduced retroactively. In this case, as in *Brimstone*, it would be "exceedingly harsh if not wholly unreasonable" to destroy retroactively the basis for the agreed rates.[17]

---

14. *See* Brief for Appellants at 10 n. 9; Brief for Appellees at 6–7.

Rates are considered agreed rates unless they are specifically set by the ICC. If mere ICC approval of a private agreement were sufficient to make rates prescribed rates, the intent of Congress in distinguishing between the two would be violated. *See*

Brimstone R.R. v. United States, 276 U.S. 104, 122–123, 48 S.Ct. 282, 72 L.Ed. 487 (1928).

15. 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487, (1928).

16. *Id.* at 121, 48 S.Ct. at 287.

17. *Id.* at 122, 48 S.Ct. at 287.

■ We think the *Brimstone* analysis is controlling in the case before us. Where joint rates are agreed upon by the parties, we will not retroactively upset the division, on the equitable grounds that railroads might not agree on such rates if they suspected the possibility of court-imposed retroactive change. We reach this result taking into account the action of Congress in ruling out retroactivity where agreed rates are involved, and the philosophy of *Brimstone* in avoiding the "exceedingly harsh" consequences of a ruling that carriers agreeing to divisions could have imposed on them an open-ended contingent liability of enormous proportions.

■■ If a railroad believes the division of agreed joint rates to be unreasonable or unfair, it may apply to the ICC for a prospective adjustment of the division. The adjustment would be effective as of the date of the ICC order of adjustment. We must give deference to the overall scheme of Congress to place railroad rate regulation in the hands of the ICC. But it did not see fit to confer upon the ICC the power to adjust retroactively divisions of rates agreed upon by the carriers, for the reasons enunciated in *Brimstone* and here. The plight of the northern lines arises from the obviously foreseeable situation we have here. Whether relief in this and similar cases, present and future, should come from a revision of the statute, or an acceleration of the glacial movement at the ICC, is not for us to say. We do not hold that under no circumstance could a court exercise its equitable judicial discretion, for neither Congress in the statute nor the Supreme Court in *Brimstone* treated of this, but here we think it unwise to permit a railroad to circumvent the limitation on the ICC's power of ret-

roactive adjustment by seeking an award of damages from this court for the period between the initiation of a complaint and a possible award of future relief by the ICC. There are no allegations of deliberate delaying tactics by the opposing carriers, nor of anything but the time-honored tardigrade pace at the ICC; in the event of obvious protracted dalliance our judgment might well be contrary.[18]

### B. Related Provisions of the ICC Act and Common Law Remedies

We do not believe that other provisions of the Interstate Commerce Act dictate a result different from the one which we reach. The northern railroads' argument that sections 1(4), 8, 9, and 22 [19] suggest the court should order retroactive relief here is unpersuasive.

■ In brief, the pertinent provisions of the sections are as follows. Section 1(4) requires railroads to establish "just and reasonable rates" and "just, reasonable, and equitable divisions" of joint rates. Section 8 provides that railroads failing to perform according to the Act are liable for damages due to such violations. Section 9 allows those damaged by violations to sue in court for recovery of damages. Section 22 states that "nothing in this part contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this part are in addition to such remedies . . . ." Finally, a 1940 amendment to the Act declares the policy of Congress is "[to] foster sound economic conditions in transportation and among the several carriers . . . all to the end of developing, coordinating, and preserving a national transportation system . . . "

18. When the northern railroads first sought a change in divisions, it took nine years before the ICC entered an order. This strikes the court as an unreasonably long time, notwithstanding the fact that three of those years resulted from a request by the parties for a delay. *See* Brief for Appellant at 6 n. 3.

There is presently pending in the House of Representatives a proposed amendment to the Surface Transportation Act which would require the ICC to hand down a ruling on these divisional questions within 32 months.

19. These sections are also codified in Title 49, U.S.Code.

Construing these provisions broadly, we cannot agree with the northern railroads that they compel award here of retroactive damages by this court. First, it is not at all clear that our national transportation system would be better served under the approach suggested by the northern railroads than by refusing the sharp disruptions due to retroactive division changes. Second, it would appear irrational to hold the southern railroads as violating section 1(4)'s requirement of reasonable divisions when the divisions have been approved by the ICC. Insofar as there is a statutory obligation to provide reasonable divisions and rates, the statutory framework and context define a duty as implemented by orders of the ICC,[20] a duty which is necessarily prospective in the case of agreed rates.

■ Furthermore, we do not accept the northern railroads' contention that a common law remedy should be adopted here. While section 22 does explicitly retain common law remedies, it does so with the implicit understanding that only such remedies as are consistent with the statute are to be retained. As noted long ago by the Second Circuit, "from the passage of the Interstate Commerce Act previously existing common-law remedies, inconsistent with the statute, were supplanted." [21]

The Second Circuit concluded in 1936 that a common law remedy should not be applied in a case which was similar in many ways to the case at bar.[22] In the case before the Second Circuit, the ICC had prescribed new joint rates but not the percentage of division thereof. The northern railroads thereafter refused to accept the previously agreed-upon division. The southern railroads sought a more favorable division from the ICC, which ordered a change in percentage of division effective on the date of the filing of the complaint, not at the earlier date of the new joint rates. The southern railroads then sought relief from the court for the period from the time the ICC prescribed the joint rates until the date the complaint was filed. The Second Circuit denied such relief, stating that

> Section 15(6) clearly indicates an intention to limit the operation of retroactive adjustments of divisions. . . . It is not enough to say that, because of established principles of equity and common law, a reasonable share of the proceeds of the transportation was due the appellants for the services performed. The remedy conferred by the Interstate Commerce Act and the one by which the appellants' rights are governed defined the

---

20. Cf: Holloway v. Bristol-Myers, 158 U.S. App.D.C. 207, 485 F.2d 986 (1973). While both the divisions and the rates were originally prescribed by the ICC, rate increases, leaving the divisions untouched, have made the rates "agreed rates."

It is interesting to note the Supreme Court's statement in Alton R.R. v. United States, 287 U.S. 229, 235–236, 53 S.Ct. 124, 126, 77 L.Ed. 275 (1932):

So long as the joint rates voluntarily established remain in force, each carrier is entitled as of right to the division originally agreed upon, unless a readjustment of the divisions has been made either by the parties or by the Commission pursuant to the power conferred by paragraph 6 of § 15. . . . If they deemed its divisions unreasonably large, they could have invoked the power of the Commission to make a reduction.

21. Atlantic Coast Line R.R. v. Delaware & H.R. Corp., 86 F.2d 721, 723 (2d Cir. 1936).

*See also* Texas & Pac. Ry. v. Abilene Cotton Oil Co., 204 U.S. 426, 446–447, 27 S.Ct. 350, 51 L.Ed. 553 (1907), where the Supreme Court stated,

[Section 22] cannot in reason be construed as continuing in shippers a common-law right, the continued existence of which would be absolutely inconsistent with the provisions of the act. In other words, the act cannot be held to destroy itself. The clause is concerned alone with rights recognized in or duties imposed by the act, and the manifest purpose of the provision in question was to make plain the intention that any specific remedy given by the act should be regarded as cumulative, when other appropriate common-law or statutory remedies existed for the redress of the particular grievance or wrong dealt with in the act.

22. Atlantic Coast Line R.R. v. Delaware & H.R. Corp., 86 F.2d 721.

procedure by which justice could be obtained.[23]

While the Second Circuit dealt with prescribed rates and we deal with agreed rates, there is a key similarity: both cases involve retroactive application of a remedy by a court, a remedy which is clearly proscribed in section 15(6) with regard to the ICC. We follow the route charted by the Second Circuit and deny a common law remedy here.[24] We think that route preferable to the approach taken by district courts in Maryland and Pennsylvania in 1935 cases.[25]

Contrary to the suggestion of the northern railroads, we do not believe that the Supreme Court decision in Hewitt-Robins, Inc. v. Eastern Freight-Ways, Inc. mandates application of a common law remedy by us. As to "the survival of a judicial remedy under the saving clause," the Court held:

> Survival depends on the effect of the exercise of the remedy upon the statutory scheme of regulation. According to [the saving clause], if the remedy is inconsistent with that scheme it does not survive. . . . Here, . . . the exercise of the judicial remedy supports its overall purposes and is nowise inconsistent with the congressional scheme embodied within its four corners.[26]

The same could not be said in our case; we deny the judicial remedy as "inconsistent with the congressional scheme" in the situation at bar.

Furthermore, the Court in *Hewitt-Robins* rested its decision on the particular factors involved there in carrier routing practices, and specifically distinguished the case from challenges regarding reasonableness of rates. Thus, the doctrine of T.I.M.E., Inc. v. United States[27] was left standing when questions of the reasonableness of charges were at issue. It is important to note also that both cases dealt with the Motor Carrier Act rather than the portion of the Interstate Commerce Act at issue in the case at bar.

We thus conclude that it would be inconsistent with the thrust of section 15(6) and prior judicial decisions to grant the relief sought by the northern railroads. Under the circumstances of this case, retroactive changes in divisions should not be judicially ordered. The decision below granting summary judgment to appellees and dismissing appellants' complaint is hereby

Affirmed.

MacKINNON, Circuit Judge (concurring):

The foregoing opinion affirms the judgment of the District Court dismissing the action by the northern railroads against the southern railroads for alleged unfair division of the revenues received from inter-area freight traffic. In my view this produces an inequitable result.

The southern railroads since 1956 have refused to agree to any changes in the divisions of joint rates because the existing divisions are apparently more favorable to them, and because of the history of the rates involved they stand to profit greatly by the long delay necessary to a Commission decision. To remedy the allegedly unfair and discriminatory rate divisions, the northern railroads in 1956 initiated a proceeding before the ICC. Nine long years later the ICC concluded that the rate divisions were indeed unfair and ordered a *substantial* readjustment of the divisions in

23. *Id.* at 724.

24. This route was also taken in Atlantic Coast Line R.R. v. Boston & M. R. R., 18 F.Supp. 886 (D.Mass.1937).

25. The Maryland District Court in Atlantic Coast Line R.R. v. Baltimore & Ohio R.R., 12 F.Supp. 711, seemed to rely on a distinction from the *Brimstone* case, *viz.*, that there were agreed rates in *Brimstone* but not in the Maryland case. Such distinction,

even assuming it valid, is inapplicable here. The Pennsylvania District Court opinion in Atlantic Coast Line R.R. v. Pennsylvania R. R., 12 F.Supp. 720, is inconsistent with the logic we find persuasive here.

26. 371 U.S. 84, 89, 83 S.Ct. 157, 160, 9 L. Ed.2d 142 (1962).

27. 359 U.S. 464, 79 S.Ct. 904, 3 L.Ed.2d 952 (1959).

favor of the northern lines. However, the case was remanded to the ICC after the Supreme Court determined that the ICC had not applied proper standards. In 1971, since the evidence had become stale, the 1956 proceedings were aborted.

In 1972 the northern railroads renewed their battle by initiating another ICC proceeding based on the then current factual situation. Simultaneously the northern railroads began the instant common law action to correct what they allege is a grossly unjust condition that has continued for over 16 years.

Under section 15(6) of the Interstate Commerce Act, adjustments by the ICC of rate divisions of *agreed* rates can only operate prospectively from the date of the ICC order determining the proper divisions. Had the rates been prescribed by the ICC, the Commission would have the power to adjust rate divisions retroactively from the time of the filing of the complaint. Thus, while the northern railroads' complaint to the ICC was filed on March 27, 1972, and it may be many years before the ICC resolves the question, the Commission is powerless under the statute to effectuate fair divisions for the interim period between March 1972 and the eventual date of the final order.

In the 1956 proceeding between these same parties nine years elapsed from the filing of the complaint to the date of the final ICC order. Recognizing that a considerable number of years may elapse before there is a final order in the present proceeding, the northern railroads seek by the instant common law action for damages to secure equitable divisions (if the ICC eventually determines that present divisions are unjust, unreasonable and inequitable) for the interim years between the filing of the complaint and the final decision of the ICC. There is nothing inequitable or harsh in recognizing the validity of a lawsuit that would provide reparations for this interim period if it is ultimately determined that the divisions during this period were unfair. Indeed, if appellants can prove the allegations in their complaint, it would be inequitable and harsh to deny relief on a claim which involves not only many millions of dollars [1] but may also involve the very solvency of some of the northern railroads. For the purpose of this appeal from the District Court's dismissal of the complaint for failure to state a claim, the factual allegations in the complaint must be assumed valid, including the following allegation:

Such refusal by the Southern lines to adjust the Divisions has deprived the Northern lines of several million dollars a year and unjustly enriched the Southern lines by a like annual amount. This deprivation has contributed to the bankruptcy or near bankruptcy of several of the Northern lines thus jeopardizing the continuing viability of the National Transportation System.

Complaint, Jt.App. at 23a.

Elaborating on this allegation, appellants' brief sets forth the following statistics showing the rates of return on net investment for the Class I railroads by territorial group. The figures for the Eastern District relate primarily to the railroads here referred to as the Northern Lines:

| | 1967 | 1968 | 1969 | 1970 | 1971 | 12 Mos. Ending 9/30/72 |
|---|---|---|---|---|---|---|
| Eastern District | 1.58 | 1.27 | 1.10 | Deficit | Deficit | Deficit |
| Southern District | 3.86 | 3.79 | 4.17 | 4.50 | 4.93 | 5.26 |
| Western District | 2.75 | 3.01 | 2.81 | 3.02 | 3.90 | 4.00 |
| United States | 2.46 | 2.44 | 2.36 | 1.73 | 2.47 | 2.57 [2] |

1. Had the $8 million in annual damages that the ICC determined in 1965 been paid to the northern railroads from the date of the complaint (1956) to the present time, the northern railroads would have received approximately $144 million in damages.

2. Brief for Appellants at 9. Sources: Association of American Railroads, Railroad

Appellants' brief further states:

Six of the major, i. e. Class I, Northern carriers are now in bankruptcy. The Chairman of the Inter-State Commerce Commission has testified before the Congress that at least eight other major Northern roads are "marginal roads" on the brink of financial collapse. The Southern roads, on the other hand, are as a group the most profitable in the nation, earning a 4.93% rate of return for 1971 as contrasted with the Northern lines' deficit for that year, and not a single one of the Southern Class I roads is described by the Chairman of the Commission in the aforementioned testimony as a marginal road. The millions of dollars of revenues which the Southern roads receive in unfair divisions at the expense of the Northern roads obviously contribute to the plight of the Northern roads.

Brief for Appellants at 8-9 (footnotes omitted). The news media recently carried the following report which updates some of this data concerning one of the principal southern railroads:

### SOUTHERN RAILWAY POSTS RECORD NET

[Southern Railway System] . . . reported record quarterly and six-month earnings yesterday.

\*   \*   \*   \*   \*   \*

Southern earned $29,991,000, or $2.-01 a share, compared with $20,246,000 or $1.36 for the second 1973 quarter.

AT THE SAME TIME, Southern's board raised the dividend on common stock a nickel a share to 53 cents for the quarter, payable Sept. 16 to shareholders of record Aug. 15.

Southern President W. Graham Clayton, Jr. [sic] predicted the railroad's earning would increase still further, largely as a result of a 10 percent general freight rate increase that became effective June 20.

FOR THE FIRST HALF of 1974, Southern earned $49,498,000 or $3.29 a share, up 48.1 percent over the $38,556,000 and $2.58 in the first half of 1973.

Total operating revenues for the latest quarter were $233,126,000, up 16.6 percent from the 1973 quarter, and for the six months totaled $444,990,000, a 14.1 percent gain.

Washington STAR–NEWS, July 24, 1974.

Section 1(4) of the Interstate Commerce Act prescribes a substantive standard which requires every common carrier to establish "just, reasonable and equitable divisions" of joint rates. 49 U.S.C. § 1(4) (1970). Sections 8 and 9 provide a means to enforce the duty established by section 1(4). Section 8 makes a carrier who fails to comply with section 1(4) responsible for the "damages sustained in consequence of any such violation," and section 9 provides that the injured party may "make complaint to the Commission . . . or may bring suit . . . in any district court of the United States of competent jurisdiction." *Id.* §§ 8, 9. Additionally, since the enactment of the original statute in 1887, section 22 has guaranteed the availability of all common law remedies:

[N]othing in this act contained shall in any way abridge or alter the remedies now existing at common law or by statute, but the provisions of this act are in addition to such remedies

·   ·   ·   ·

*Id.* § 22(1). It would seem that broader protection of common law remedies could not be fashioned.

The Act is thus explicit and complete, insofar as its specific language is concerned, in preserving all common law remedies, and it emphasizes such intent by stating that the Commission remedies are "in addition" to the previously existing common law and statutory remedies.

---

Facts, 1972, at 18: Tabulations prepared by Economics and Finance Department, Association of American Railroads: Property In-

vestment and Condensed Income Accounts, 1971; Railroad Revenues, Expenses, and Income, Third Quarter 1972.

**1274**

Nevertheless, the foregoing opinion concludes that because the statute denies the Commission authority to grant relief from inequitable divisions of agreed rates for the interim period between the filing of the complaint and the decision by the Commission, the courts similarly lack such power.

It would not be inequitable to grant retroactive relief against the southern railroads because they are placed on notice from the date of the service of the complaint that their income may be excessive, and they can establish appropriate reserves and contingent accounts. It is much more inequitable to perpetuate unjust enrichment to the extent of millions of dollars. What this situation resolves itself into is a claim that appellants have a right to a tremendous sum of money but the courts have presently held that no remedy exists to collect it.

The ICC lacks the power retroactively to adjust divisions of agreed rates because of section 15(6) which provides:

(6) *Commission to establish just divisions of joint rates, fares, or charges —Adjustments.*—Whenever, after full hearing upon complaint or upon its own initiative, the Commission is of opinion that the divisions of joint rates, fares, or charges, applicable to the transportation of passengers or property, are or will be unjust, unreasonable, inequitable, or unduly preferential or prejudicial as between the carriers parties thereto (whether agreed upon by such carriers, or any of them, or otherwise established), the Commission shall by order prescribe the just, reasonable, and equitable divisions thereof to be received by the several carriers, *and in cases where the joint rate, fare, or charge was established pursuant to a finding or order of the Commission and the divisions thereof are found by*

*it to have been unjust, unreasonable, or inequitable, or unduly preferential or prejudicial, the commission may also by order determine what (for the period subsequent to the filing of the complaint or petition or the making of the order of investigation) would have been the just, reasonable, and equitable divisions thereof to be received by the several carriers, and require adjustment to be made in accordance therewith.*

*Id.* § 15(6) (emphasis added). While Congress clearly intended to circumscribe the authority conferred upon the ICC, there is no indication in the specific language used that Congress intended to limit the traditional powers of the courts in common law actions. To the contrary, the statute explicitly states that everything in the Act is "in addition to" the common law remedies and that the Act does not "in any way" abridge or alter the common law remedies. *Id.* § 22. The construction placed on section 15(6) by the foregoing opinion effectively nullifies section 1(4) and section 8 of the statute which require all carriers to establish equitable divisions of joint rates and make carriers who fail in this responsibility liable for the damages sustained in consequence of any such violation.[3] How can a carrier who violates section 1(4) be liable in damages under sections 8 and 9 if the damaged parties cannot collect the damages? Yet that is the effect of the decisions cited by the foregoing opinion, particularly the *Brimstone* case[4] and Atlantic Coast Line R.R. v. Delaware & H.R. Corp.[5] in the Second Circuit.

However, other courts have held that section 15(6) does not prevent a common law action for damages resulting from unreasonable division of joint through rates.[6] In Atlantic Coast Line R.R. v.

---

3. See text *supra* at 1273.

4. Brimstone R.R. v. United States, 276 U.S. 104, 122–123, 48 S.Ct. 282, 72 L.Ed. 487 (1928).

5. 86 F.2d 721 (2d Cir. 1936).

6. Atlantic Coast Line R.R. v. Baltimore & Ohio R.R., 16 F.Supp. 647 (D.Md.1936); Atlantic Coast Line R.R. v. Baltimore & Ohio R.R., 12 F.Supp. 711 (D.Md.1935); Atlantic Coast Line R.R. v. Pennsylvania R.R., 12 F.Supp. 720 (E.D.Pa.1935).

Baltimore & Ohio R.R., 12 F.Supp. 711 (D.Md.1935), Judge Chestnut reasoned:

> After a review of the cases, I reach the conclusion that the controlling consideration as to whether the court has jurisdiction in this case is to be found in the answer to the question whether the exercise of this jurisdiction would necessarily be inconsistent with the Interstate Commerce Act as a whole (49 USCA § 1 et seq.). And in my opinion this question must be answered in the negative. Conceding that it would have been preferable for Congress to have committed the readjustment of the rates with respect to the period now in question primarily to the Commission, and that the Commission as an expert body constantly dealing with matters of this kind is much better equipped to pass on the question than the courts, it still does not follow that the plaintiff ought to be remediless in this case; nor that the essential purposes of the Interstate Commerce Act would be frustrated by the exercise of jurisdiction here.

*Id.* at 716.

Although the strict language of the statute preserves the common law action, the foregoing opinion correctly perceives the effect of the specific holding in *Brimstone* as ruling out such an action in cases seeking retroactive divisions, even though *Brimstone* never really faced up to the conflict of its holding with the language of sections 1(4), 8 and 22. In the face of *Brimstone,* however, it is my opinion that the situation must be corrected, if at all, by the Supreme Court or by Congress. Congress has been informed of the problem and the Northern Lines testified that they were prepared to submit corrective legislation.[7]

The northern railroads appear to be locked into their continuing deficits by the recalcitrant attitude of the southern railroads. It may be true that the present divisions are fair, but they may not be. If a court trial were held, the justness of the rates could be determined. The primary jurisdiction doctrine would require the ICC first to fix proper divisions and the trial court would then determine whether equity requires that whole or partial retroactivity be applied. But the *Brimstone* decision indicates that there is no remedy for this wrong which is allegedly substantial, of long duration and likely to continue.

I thus concur reluctantly in what I consider to be a most inequitable result as dictated by the *Brimstone* decision.

---

7. Hearing before the Subcommittee on Transportation and Aeronautics of the House Committee on Interstate and Foreign Commerce on H.R. 6591, et al. (Northeast Rail Transportation), May 8, 1973, pp. 280–83 (93d Cong., 1st Sess.) :

> Mr. Langdon. We have, in our situation, sir, in considering the Northeast as a whole, as we compute it, a deficit of about $100 to $125 million a year arising from what we regard as improper divisions of rates applying to and from the West and the South.
>
> \*  \*  \*  \*  \*
>
> Mr. Langdon. Yes, sir, that has been drafted and we are prepared to submit it. What it does is give the Commission power to fix divisions retroactively.