584 F.2d 408
 189 U.S.App.D.C. 250
 FARMERS UNION CENTRAL EXCHANGE et al., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION* and the
United States of America, Williams Pipe Line Co.,
Explorer Pipeline Co., Intervenors.
 No. 76-2138.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued April 5, 1978.
Decided June 27, 1978.
Rehearing Denied July 25, 1978.
Certiorari Denied Nov. 27, 1978.
 
 See 99 S.Ct. 596.
 John M. Cleary, Washington, D. C., with whom Frederic L. Wood, Washington, D. C., was on the brief, for petitioners.
 
 
 1
 Ron M. Landsman, Atty., Dept. of Justice, Washington, D. C., with whom John J. Powers, III, Atty., Dept. of Justice, Washington, D. C., was on the brief, for respondent, the United States.
 
 
 2
 Christine N. Kohl, Atty., I. C. C., Washington, D. C., with whom Mark L. Evans, Gen. Counsel and Charles H. White, Jr., Associate Gen. Counsel, Washington, D. C., were on the brief, for I. C. C.
 
 
 3
 J. Paul Douglas, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Philip R. Telleen, Atty., Federal Energy Regulatory Commission, Washington, D. C., was on the pleadings, for respondent, Federal Energy Regulatory Commission.
 
 
 4
 Robert G. Bleakney, Jr., Boston, Mass., with whom David M. Schwartz and Robert L. Calhoun, Washington, D. C., were on the brief, for intervenor, Williams Pipe Line Co.
 
 
 5
 Donald W. Markham, Washington, D. C., with whom Jonathan B. Hill, Washington, D. C., was on the brief, for intervenor, Explorer Pipeline Co.
 
 
 6
 Hanford O'Hara, Atty., I. C. C., Washington, D. C., entered an appearance for I. C. C.
 
 
 7
 Robert B. Nicholson and Andrea Limmer, Attys., Dept. of Justice, Washington, D. C., entered appearances for respondent, United States.
 
 
 8
 Before McGOWAN, LEVENTHAL and WILKEY, Circuit Judges.
 
 
 9
 Opinion for the Court filed by McGOWAN, Circuit Judge.
 
 McGOWAN, Circuit Judge:
 
 10
 Petitioners, a group of oil shippers, challenge an order of the Interstate Commerce Commission (ICC) sustaining (1) increased rates filed by intervenor Williams Pipe Line Co. (Williams) and (2) joint rates initiated by Williams and intervenor Explorer Pipeline Co. (Explorer), as against claims that the former are unreasonably excessive, See 49 U.S.C. § 1(5)(a), and the latter are discriminatory, See id. § 2, and illegally preferential, See id. § 3(1).
 
 
 11
 This review proceeding is unique in that, while pending before us awaiting briefing and oral argument, jurisdiction over the rates in question was transferred by Congress from the ICC to the Federal Energy Regulatory Commission (FERC), and the latter has been substituted for the ICC as the respondent agency. FERC has advised this court that it takes no position with respect to the merits of the order under attack, and urges us rather to forego adjudication on the merits in favor of a remand of the case to it so that it can formulate, independently to the ICC, the regulatory principles it finds to be suitable for application in this new area of responsibility committed to it. The United States, a statutory respondent, purporting to see deficiencies in the ICC's decision, supports FERC's remand request.
 
 
 12
 The court, now having had the benefit of full briefing and oral argument of the merits by all parties except FERC, has concluded, to the extent and for the reasons hereinafter appearing, to remand the case to FERC for determination by it, under its new authority, of the compatibility of the subject rates with 49 U.S.C. § 1(5)(a), and, in light of its findings thereon, for examination of the preference issue under Id. § 3(1). As to the existence of discrimination, however, petitioners' failure properly to raise the issue before the ICC mandates our affirmance of that agency's decision insofar as it is based on Id. § 2.
 
 
 13
 * Williams, an independent common carrier, is a relatively new entrant in the oil pipeline transmission industry, having begun doing business in 1966 with the purchase of Great Lakes Pipe Line Co. (Great Lakes). It acquired the physical assets of Great Lakes from eight petroleum producer-owners for $287.6 million the highest among the competitive bids received.[1] The pipeline system thus acquired serves a large portion of the Midwest, with connections in such producing and refining cities as Tulsa, Fargo, Lincoln, and Topeka, and in such consuming cities as East St. Louis, Chicago, and Minneapolis. By interconnecting with intervenor Explorer Pipeline Co. (Explorer) at Tulsa, Williams also may connect refineries located along the Gulf Coast of Texas and Louisiana with consumers in the Midwest.
 
 
 14
 Petitioners are a group of oil producers and refiners located primarily in the Great Plains area who historically have used the Great Lakes-Williams pipeline system to transport their petroleum products to the Midwest. In late 1971 and early 1972, Williams informed them that it was raising its rates by approximately 15 percent (or 3 cents a barrel) across the board. At the same time as it generally increased its rates, Williams, together with Explorer, initiated joint rates for through service from the Gulf Coast to the Midwest. These joint rates are uniformly 9.5 cents a barrel lower than the combination of Williams' and Explorer's local rates.
 
 
 15
 Shortly after the appropriate tariffs were filed with the ICC, petitioners made them the subject of complaints under the provisions of the Interstate Commerce Act which, Inter alia, regulates oil pipeline rates, 49 U.S.C. § 1(1) (b). Petitioners' protests led the ICC to initiate investigations into the lawfulness of both sets of rates, although the disputed rates have remained in effect without suspension since their inception, pending the outcome of these proceedings. Although many claims were originally raised by the parties, the course of administrative consideration has left three major issues of import on appeal.
 
 
 16
 First, petitioners argue that Williams' rate increases for the transportation of oil in the area formerly served by Great Lakes are unreasonable under Id. § 1(5)(a),[2] because they are derived from an inflated valuation rate base[3] and allow an excessive rate of return on that rate base (10%); and further because certain operating expenses[4] and tax allowances[5] used by Williams in computing its rates were unreasonable. Second, petitioners claim that by charging them local rates to transport their oil from the Great Plains to the Midwest while charging the Gulf Coast shippers less (per mile) under the joint Williams-Explorer rates to transport their oil to the same destinations, intervenors are giving the Gulf Coast shippers an unjust preference. Id. § 3(1).[6] Finally, petitioners argue that by unevenly dividing the joint rate revenues with Explorer, Williams is giving the eight Gulf Coast shippers that jointly own Explorer a discriminatory rebate. Id. § 2.[7] Petitioners asked the ICC to order Williams to lower and Williams and Explorer to readjust the rates in question, and to pay reparations plus interest, costs, and attorneys' fees.
 
 
 17
 Petitioners do not contest the propriety of the procedures used by the ICC in adjudicating their complaints. The administrative law judge announced his decision favorable to Williams on June 6, 1974, after holding several days of formal hearings in 1972 and 1973 and after considering copious written submissions. Petroleum Products, Williams Bros. Pipe Line Co. (unpublished initial decision) (hereinafter referred to as Initial Decision and cited to Joint Appendix (JA)). Exceptions were filed by the petitioners on both sets of issues, thereby entitling them to consideration by a three-commissioner division of the ICC. On the basis of the record as well as the exceptions and replies filed by the parties, the division, one commissioner dissenting, accepted the findings of the administrative law judge. Petroleum Products, Williams Bros. Pipe Line Co., 355 I.C.C. 102, 126 (1975) (hereinafter referred to as Williams I ).
 
 
 18
 Petitioners next asked the entire Commission to reconsider the case, arguing that it involved "matters of general transportation importance" the standard that must be met to secure reconsideration by the full Commission. Although asserting that the issues did not rise to the requisite level of importance, the full Commission felt that reconsideration of the record, as supplemented by written submissions by the parties, was merited "because of the relative dearth of precedent concerning petroleum pipeline rates, and in view of the substantial sums of money at issue. . . ." Petroleum Products, Williams Bros. Pipe Line Co., 355 I.C.C. 479, 481 (1976) (hereinafter referred to as Williams II ). In an opinion filed December 3, 1976, the full Commission, one commissioner dissenting and two not participating, affirmed the findings of the administrative law judge and the division, Id., and petitioners sought direct review by this court.
 
 II
 A.
 
 19
 In 1906, the Interstate Commerce Act of Feb. 4, 1887, c. 104, 24 Stat. 379, was amended by the Hepburn Act to include companies engaged in the "transportation of oil . . . by pipe line" among the common carriers subject to regulation thereunder. Act of June 29, 1906, c. 3591, § 1, 34 Stat. 584. Yet, while pipeline companies joined railroads, and were later joined by motor carriers, as regulatory subjects of the Interstate Commerce Act, those companies never faced the degree of regulation to which the vehicular common carriers were subject. Thus, while under the same duty as railroads and/or motor carriers to furnish or allow continuous transportation, 49 U.S.C. §§ 1(1), 1(4), 7, to establish, file, and publish reasonable, nondiscriminatory rates subject to ICC approval, Id. §§ 1(5), 3(1), 4(1), 6, 15(1), to avoid certain pooling relationships, Id. § 5(1), to file certain financial reports, and to use certain accounting procedures subject to ICC specifications, Id. §§ 20(1), (2), (4), (5), pipeline companies have none of the special obligations imposed upon the vehicular regulatees under the Act concerning acquisitions, mergers, corporate affiliates, uniform cost and revenue accounting, issuance of securities, and corporate or financial reorganizations. Id. §§ 5(2)-(13), 20(3), 20a, 20b, 20c. For this reason, we may infer a congressional intent to allow a freer play of competitive forces among oil pipeline companies than in other common carrier industries and, as such, we should be especially loath uncritically to import public utilities notions into this area without taking note of the degree of regulation and of the nature of the regulated business. See J. Bonbright, Principles of Public Utility Rates 4-5 (1961).
 
 
 20
 Consequently, beyond the general outlines of the Interstate Commerce Act, and the specific provisions therein dealing with ratemaking, See notes 2, 6 & 7 Supra, we have little to rely on in constructing a theory of oil pipeline ratemaking. Although the Act, as amended by the Valuation Act, 37 Stat. 701 (1913), does provide the ICC with the wherewithal to gather the information necessary to determine the "valuation" of railroads And oil pipeline companies, 49 U.S.C. § 19a, See note 3 Supra, we see nothing in the Valuation Act that requires the agency to translate its valuation authority into a mandatory approach to ratemaking or that makes a valuation approach inevitably reasonable.[8]
 
 
 21
 ICC precedent provides little additional guidance as to appropriate ratemaking methodology for the oil pipeline industry. In the four published opinions in which it has heretofore discussed oil pipeline ratemaking, the ICC adopted the valuation rate base without discussion, or even explicit recognition, of alternative bases. Reduced Pipe Line Rates and Gathering Charges, 243 I.C.C. 115 (1940) (hereinafter Reduced Rates I ), Reopened, 272 I.C.C. 375 (1948) (hereinafter Reduced Rates II ); Petroleum Rail Shippers' Ass'n v. Alton & So. R. R., 243 I.C.C. 589 (1941); Minnelusa Oil Corp. v. Continental Pipe Line Co., 258 I.C.C. 41 (1944). Nonetheless, the ICC's use in the 1940's of the "fair value" method is not hard to explain and in that explanation lies an important reason to reexamine the continued viability of the decisions announced during that era.
 
 
 22
 The ICC's primary experience with ratemaking prior to the 1940's involved railroads, as to which a landmark Supreme Court case had appeared to mandate the fair value method of ratemaking. Smyth v. Ames, 169 U.S. 466, 546-47, 18 S.Ct. 418, 42 L.Ed. 819 (1898); See note 8 Supra. See also St. Louis & O'Fallon Ry. Co. v. United States, 279 U.S. 461, 49 S.Ct. 384, 73 L.Ed. 798 (1929). Subsequently, the Supreme Court's endorsement on this method was extended to other areas. E. g., Southwestern Bell Tel. Co. v. Missouri Pub. Serv. Comm'n, 262 U.S. 276, 43 S.Ct. 544, 67 L.Ed. 981 (1923). Although under the impetus of Justice Brandeis' concurring opinion in the last-cited case, Id. at 289-312, 43 S.Ct. 544, the Supreme Court during the 1930's began to countenance experimentation with other ratemaking approaches, E. g., Railroad Comm'n of California v. Pacific Gas Co., 302 U.S. 388, 399, 58 S.Ct. 334, 82 L.Ed. 319 (1938), by this time the ICC had established a firm practice of using the valuation method. E. g., Petroleum Rail Shippers, supra. Thus, the ICC practice, reflected in the four pipeline rate cases cited earlier, of using a valuation rate base had become ensconced in that agency's decision by 1944, when the Supreme Court decisively reversed its field and became openly critical of talismanic reliance on "fair value." FPC v. Hope Natural Gas Co., 320 U.S. 591, 601, 64 S.Ct. 281, 88 L.Ed. 333 (1944). Moreover, between the time that Hope's implications became clear and the ICC's consideration of this case, that agency did not have occasion to discuss the principles of oil pipeline ratemaking.[9] As such, we are left to draw our conclusions about this case based on a series of ICC opinions that arose in a ratemaking environment that has since been dramatically altered by the Supreme Court.[10]
 
 
 23
 In addition to the significant changes in the relevant Legal environment since the ICC's 1940's decisions, important Economic transformations have occurred. First, that agency's only actual comparison in the 1940's of the "valuation" of pipeline assets and the actual investment therein "as carried on (the pipeline companies') books" (I. e., apparently, original cost) shows that in a majority of cases "the valu(ations) found by the Commission were materially Lower than the carriers' investment. . . ." Reduced Rates I, supra, 243 I.C.C. at 138 (emphasis added). This 1940's situation is in marked contrast to that experienced in today's inflationary economy wherein valuation typically Exceeds investment by a substantial amount.[11]
 
 
 24
 Second, based on rather detailed analyses of economic conditions facing the industry in the 1940's, the Commission's 1940's decisions determined that oil pipeline rates should allow carriers to recover operating expenses plus no more than either an 8 percent return on value for transmission of crude oil or crude oil plus refined petroleum products, Reduced Rates II, supra, 272 I.C.C. at 376, 384 (rates upheld actually producing 7.6 percent rate of return); Minnelusa, supra, 258 I.C.C. at 54; Reduced Rates I, supra, 243 I.C.C. at 142, Or a 10 percent return on value for transmission of gasoline. Petroleum Rail Shippers, supra, 243 I.C.C. at 663. The ICC pointed out that by 1940's standards these rates of returns were
 
 
 25
 somewhat larger . . . than . . . would be reasonable to expect would be applied in industries of a more stable character, where the volume of traffic is more accurately predictable.
 
 
 26
 Minnelusa, supra, 258 I.C.C. at 54, Accord, Petroleum Rail Shippers, supra, 243 I.C.C. at 661-62; Reduced Rates I, supra, 243 I.C.C. at 142.
 
 
 27
 In the Commission's estimation, these "somewhat larger" rates of return were justified on the one hand by the need to attract capital to the oil pipeline industry despite the higher-than-normal risks faced by carriers of petroleum products,[12] and especially of gasoline,[13] and on the other hand, by the need to keep rates low enough to forestall the dangers of oligopolistic control of the oil pipeline industry by the big producers.[14] Other factors considered by the ICC were the possibility of price fixing[15] and a history of "enormous" profits,[16] the cost effects of greatly increased taxation during the 1930's,[17] the increased demand for oil products, the improved technology of pipeline transmission precipitated by World War II,[18] and the prediction that economic forces would cause rates to drop regardless of ICC action.[19] Notably, aside from brief discussions of increased labor costs, the ICC's decisions make clear that operating costs other than taxes were relatively free from inflationary (or deflationary) influences from 1937 to 1947.[20]
 
 
 28
 To the extent that economic conditions facing the oil pipeline industry have changed since 1948 and, in light of the modern onslaught of inflation, petroleum shortages, and reliance on imports, as well as the maturing of the industry itself, we may readily assume they have the conclusions of the ICC in its earlier cases as to appropriate rates of return are equally as much artifacts of a bygone era as is its reliance then on a valuation rate base.
 
 
 29
 Finally, the ICC's 1940's cases recede even further into the background when it is realized that the ICC has been replaced by FERC as the government agency charged with watching over oil pipeline rates.[21] The transfer of authority to FERC occurred during the pendency of this petition pursuant to the Department of Energy Organization Act (the DOE Act), Pub.L.No.95-91, § 402(b), 91 Stat. 584 (1977), Effectuated, Executive Order No. 12009, 42 Fed.Reg. 46267 (Sept. 15, 1977), Implemented, 42 Fed.Reg. 55534 (Oct. 17, 1977). Although, the DOE Act provides that litigation commenced before the transfer shall continue, with "appeals taken, and judgments rendered . . . as if this Act had not been enacted,"[22] as regards the substantive administrative law applicable in this case, the transfer further unsettles the foundations on which we must adjudicate this petition. Thus, it removes the stabilizing influence of the courts' usual desire to afford an administrative agency some latitude over time to develop its own approach to the regulatory tasks delegated to it by Congress. See Permian Basin Area Rate Cases, 390 U.S. 747, 790, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). Here, the transfer of authority has deprived us of even the possibility of endorsing ICC's attempt to develop such an approach, and, in fact, has created the likelihood that anything we say will inhibit FERC from freely developing its approach in the future. That FERC has refused to adopt the ICC's position in this case, and joined by the Antitrust Division of the Department of Justice has asked that the case be remanded to it, illustrates this problem.[23]
 
 
 30
 This background should explain our reluctance to embark on the first federal judicial foray into the area of oil pipeline ratemaking.[24] In this endeavor, beyond the statute's admonition that rates be "just and reasonable," we must rely almost entirely on the ICC's opinions in this case. Moreover, as the next section demonstrates, those opinions are characterized by analytical difficulties that undermine their usefulness in resolving the overall reasonableness of the assailed rates.
 
 B.
 
 31
 The parties have joined issue over the ICC's treatment of five criteria they deem crucial to the reasonableness of Williams' rate increases: rate base, rate of return, depreciation costs, tax treatment, and certain items of operating expenses. See notes 2-5 Supra and accompanying text. In reaching our conclusion that the ICC's decisions[25] present problems that impel us to remand the reasonableness issue to its successor, FERC, we find it necessary to dwell on only the first three of these criteria.
 
 
 32
 Despite petitioners' insistence on original cost less depreciation of all of Williams' assets used in transmitting oil (I. e., $101.1 million), and Williams' somewhat tentative advocacy of purchase price ($287.6 million) as the appropriate rate base, the ICC used a "valuation" base. Williams I, supra, 351 I.C.C. at 108. This is calculated to be $167.6 million, Id., based primarily on two factors listed in the Valuation Act, 49 U.S.C. § 19a original cost, and the cost of reproduction new.[26] All three decisions based their analyses of the rates on the percent return they allowed on valuation, so that the importance to all three of the valuation rate base cannot be gainsaid.[27]
 
 
 33
 Most prominent among the three opinions' explanations of the use of the "fair value" method was that as the "traditional," "customar(y)," and "well-established practice" of the ICC in oil pipeline cases, valuation ratemaking has "withstood the test of time." Initial Decision, supra, JA at 1608; See id. at 1605; Williams I, supra, 351 I.C.C. 105, 107, 113, 114; Williams II, supra, 355 I.C.C. at 485. In support of this "tradition," however, the opinions (when they cite any support at all) list only (1) the 1940's oil pipeline cases discussed above, (2) the Commission's history of computing valuations under the Valuation Act, and (3) the fact that the Commission's mandatory accounting procedures for pipelines, See Uniform System of Accounts for Pipeline Companies, 337 I.C.C. 518, 523 (1970), are geared to the use of a valuation rate base. See Initial Decision, supra, JA at 1605, 1608; Williams I, supra, 351 I.C.C. at 107, 113.
 
 
 34
 As our previous discussion indicates, however, these three indicia of a tradition of fair value ratemaking are weak and outmoded. Both the oil pipeline precedents and the history of valuation computations under the Valuation Act are in large measure products of a bygone era of ratemaking ushered in by the Supreme Court in Smyth v. Ames in 1898 and ushered out by that same body in Hope Natural Gas in 1944. See notes 8-10 Supra and accompanying text. To the extent that the ICC's accounting rules derive their valuation focus from the 1940's precedents and the Valuation Act, See Uniform System of Accounts, supra, 337 I.C.C. at 523, they, too, are subject to this same criticism.
 
 
 35
 Moreover, each of the three indicia suffers from infirmities of its own. First, even if we assume under Hope that valuation ratemaking might be capable of producing a viable "end result," there is no assurance in the Commission's 1940's precedents born as they were of peculiar post-depression, World War II, and post-War economic conditions that such a result will occur in the 1970's. Second, the Commission itself has seen fit to abandon its so-called tradition of valuation computation and ratemaking based thereon in the railroad area, which is equally subject to the Valuation Act. See note 9 Supra. Finally, the ICC decision setting forth pipeline accounting rules states explicitly that it is
 
 
 36
 concerned . . . with accounting rules which are not necessarily dispositive of the manner in which expenditures will be treated in a proceeding to determine the reasonable level of particular rates.
 
 
 37
 Uniform System of Accounts, supra, 337 I.C.C. at 523. This last-quoted caveat should hardly have to be express. After all, it is rates, not bookkeeping, that the statute requires to be reasonable, and there is no assurance of record, at least, that reasonable accounting measures translate automatically into reasonable rates.
 
 
 38
 In sum, we are not persuaded by the Commission's conclusion that "consistency and fairness" dictate resurrection of the "fair value" method last used thirty years ago. Williams II, supra, 355 I.C.C. at 484. To the extent that the method was wrongly grounded in the law at that time, it is no better off now. To the extent that it may have been rightly grounded in the economics of that day, the ICC has provided us with no reason to believe that three decades have not changed the situation. And, to the extent that Williams, having nothing else to depend on but the earlier cases, justifiably relied on them in adopting its rates, See id., the solution is not to perpetrate that reliance but to end it prospectively, without allowing reparations based on its occurrence in the past.[28]
 
 
 39
 Aside from the above arguments, the three ICC opinions mentioned but one other justification for the "fair value" method: the need for a ratemaking theory responsive to inflation.[29] We have no quarrel with the ICC's aspirations on this score. The Supreme Court has indicated that rates must be high enough to allow the regulatee to attract capital, and investors will be unlikely to invest if their earnings will not keep abreast of, and have some chance of exceeding, the rate of inflation. See FPC v. Hope Natural Gas Co., supra, 320 U.S. at 603, 64 S.Ct. 281. Nonetheless, the ICC's failure to assess the actual effects of inflation on Williams' ability to attract capital, and its apparent "double counting" of concerns about inflation, See Pp. --- - --- of 189 U.S.App.D.C., pp. 420-421 of 584 F.2d, Infra, cast a shadow over its conclusion that a valuation rate base properly reflects inflation.
 
 
 40
 We find the ICC's discussion of rate of return equally problematical. Here the Total emphasis is on the 1940's precedents: because 8-10 percent was a viable return for carriers of petroleum products from 1940 to 1948, it is said, so must it be today.[30] Even more so than the choice of a reasonable rate base methodology, a "reasonable rate of return" determination must be the product of the economic moment. As noted earlier, the ICC's choice in the 1940's of the 8 and 10 percent figures turned on such "hazards" as the infancy of the gasoline industry, the likelihood of disruptive discoveries of new oil fields and the unidimensional nature of the product market served by pipeline carriers, as well as on such factors as unduly high profits in the past, high taxes, and a rapidly expanding economy relatively free of inflation. See notes 12-20 Supra and accompanying text. Absent some accompanying assessment of how this complex of relevant factors has changed in thirty years, the ICC's reliance on its antiquated precedents in determining a reasonable rate of return differs little from a rule that would require modern automobile accident damages to conform to those awarded by juries in 1940.[31]
 
 
 41
 Finally, we come to the depreciation charges allowed Williams as a cost that it may recoup through its rates. Just prior to Williams' purchase of Great Lakes, it secured a Commission opinion that the Commission's accounting instructions for pipeline carrier property accounts, 49 C.F.R. § 1204-3-1 Et seq., applied to the purchase. JA at 202, 205. Under those instructions, Williams recorded its full purchase price of $287.6 million in its property account. Although the ICC informed Williams that this opinion did "not prejudice the Commission's continuing rights and responsibilities with regard to . . . rate determinations that may come before it," JA at 205, Williams used this same method of valuing its wasting assets when calculating depreciation expenses for ratemaking purposes. Allowing this revaluation, for ratemaking as well as accounting purposes, of the Great Lakes-Williams property not only greatly increased depreciation charges from that point forward, but it also withdrew any recognition that rate payers had already been charged almost $100 million for depreciation by Great Lakes.
 
 
 42
 In upholding this operating expense calculation, the Commission did little more than (1) note the calculation's congruence with its reporting and accounting rules, especially as discussed in Uniform System of Accounts, supra, and (2) point out the inability of petitioner's recommended original cost approach to keep pace with inflated property values. Williams II, supra, 355 I.C.C. at 489. Once again, we cannot countenance the ICC's current unexplained insistence on irrevocably hitching its ratemaking theory to its accounting rules. This linkage is especially troublesome because, when it wrote those rules, the Commission expressly denied them any such controlling impact on rates. See p. --- of 189 U.S.App.D.C., p. 418 of 584 F.2d Supra. It supported that express denial of linkage with a reminder that the ICC traditionally did not tie rates to "investment as shown on the carriers' books, but rather (to) . . . valuations (computed) pursuant to the (Valuation Act)." Uniform System of Accounts, supra, 337 I.C.C. at 523. Hence, we are left with the additional unexplained anomaly of a valuation rate base coexisting with a purchase price depreciation base hardly an "accepted . . . practice( )."[32]
 
 
 43
 The final irrationality is that the depreciation basis used, unlike original cost, valuation, and other possible approaches, allows depreciation charges, and thus the rates, to change dramatically from one day to the next so long as a purchase of the assets intercedes even though the cost of the carriers' public service has not actually changed. It is true that occasional acquisitions of carriers at prices deemed currently reasonable might serve as a mechanism for accurately reflecting inflation's impact on the value of such enterprises. We have our doubts, however, about either the desirability of encouraging acquisitions solely for this purpose, or of depending on their unpredictable occurrence to serve this function. In any case, the ICC in this case purports to have recognized inflation in figuring rate base (and perhaps even rate of return, See Williams II, supra, 355 I.C.C. at 487), so that a further inflation adjustment by way of increased depreciation charges would seem precipitous and itself unduly inflationary. See p. --- of 189 U.S.App.D.C., p. 419 of 584 F.2d, Supra.
 
 
 44
 The foregoing discussion illustrates our unease with the ICC's findings regarding rate base, rate of return, and depreciation costs. Those three criteria, in turn, are important enough that doubts as to them must infect our view of the Commission's ultimate finding of reasonableness.[33] Nonetheless, were this a normal case, the limited scope of review under which we operate in these proceedings might require us to look beyond ICC's rationale to the record itself, before we would be prepared to disapprove the Commission's ultimate holding. See, e. g., Permian Basin, supra, 390 U.S. at 766-67, 88 S.Ct. 1344 (rate must be upheld if total effect is reasonable); FPC v. Hope Natural Gas Co., supra, 320 U.S. at 603, 64 S.Ct. 281 (rate must be upheld, even if subject to theoretical "infirmities," if "end result" is reasonable); The Second National Natural Gas Rate Cases, No. 76-2000, Et al., slip op. at 18 (D.C.Cir. June 16, 1977) ("basic . . . requirement (is) that there be support in the public record for what is done.").
 
 
 45
 But this is not a normal ratemaking case in large measure because we are at something of a loss to know what to look for should we resort to the public record. The lack of viable precedents in this area and thus of some semblance of established ratemaking theory undercuts any confidence we have that we can make a "reasonableness" determination in the absence of some significant assistance from the agency formerly charged with making that determination in the first instance. Moreover, the record appears to be incomplete in certain significant respects. See note 27 Supra. What clinches our decision to remand on the reasonableness issue, however, is the fact that the agency Now charged with that responsibility, FERC, has requested a remand so that it may begin its regulatory duties in this area with a clean slate. While "infirmities" in an agency's methodology may not prevent us from affirming its otherwise supportable "reasonable rate" determination, See FPC v. Hope Natural Gas Co., Supra, 320 U.S. at 603, 64 S.Ct. 281, such "legal blemishes" may justify us in honoring that agency's (or its successor's) request that we remand its decision for reconsideration. Greater Boston Television Corp. v. FCC, 149 U.S.App.D.C. 322, 463 F.2d 268, 290 (1971); See note 22 Supra.
 
 
 46
 Under the circumstances presented herein, it seems logical both to avail ourselves of some additional expertise before we plunge into this new and difficult area, and to allow the relevant administrative agency to attempt for itself to build a viable modern precedent for use in future cases that not only reaches the right result, but does so by way of ratemaking criteria free of the problems that appear to exist in the ICC's approach. See note 24 Supra. Cf. Permian Basin, supra, 390 U.S. at 790, 88 S.Ct. at 1372 ("breadth and complexity of the (agency's ratemaking) responsibilities demand that it be given every reasonable opportunity to formulate methods of regulation appropriate for the solution of its intensely practical difficulties.")
 
 
 47
 We realize that this disposition is at the expense of important finality concerns, embodied herein by intervenor Williams Pipeline Co. which has already faced six years of litigation and continues to face the possibility of reparations back to 1972 should its increased rates ultimately be found unreasonable. In subordinating those concerns to the public interest in an orderly ratemaking environment for oil pipeline transmissions, we rely on assurances from counsel for FERC that the agency will move this case through its ratemaking procedures with dispatch. Moreover, because Williams is hereby being exposed to the possibility of future operations under an unreasonable rate, not because of its own actions freely taken in the past, but because of FERC's quasi-legislative action[34] taken with our sanction with an eye to the future activities of all oil pipeline carriers, we are comforted by the apparent applicability of the rule that reparations are generally not available when the subject rates were in force as a result of quasi-legislative actions of a regulatory agency.[35]
 
 
 48
 For all of the foregoing reasons, we remand the case to FERC for determination of the reasonableness of Williams' rates pursuant to 49 U.S.C. § 1(5)(a). As a result of the necessity of remanding this issue, we are also constrained not to decide the preference/prejudice issue under 49 U.S.C. § 3(1). See note 6 Supra and accompanying text. This latter issue involves, Inter alia, questions of (1) whether a disparity exists between Williams' local rates and the through rates it has jointly initiated with Explorer, (2) if so, whether petitioners are competitively damaged thereby, and (3) if so, whether cost differentials or other "transportation conditions," justify the disparity. See State of New York v. United States, 568 F.2d 887 (2d Cir. 1977); Chicago & E. Ill. R. R. v. United States, 384 F.Supp. 298, 300-01 (N.D.Ill.1974) (three-judge court), Aff'd mem., 421 U.S. 956, 95 S.Ct. 1943, 44 L.Ed.2d 445 (1975). Since, on remand of the reasonableness issue, FERC will undoubtedly obtain additional evidence and conceivably could order that Williams lower its local rates, the nature of each of these three questions might change significantly on remand, so that any examination by us would be premature. Accordingly, FERC should also fully reconsider the section 3(1) issue.[36]III
 
 
 49
 Petitioners also challenge the joint rates filed by Explorer and Williams, claiming that they work an illegal discrimination under section 2 of the Interstate Commerce Act, 49 U.S.C. § 2. Section 2 prohibits a carrier from granting a special rate or rebate to any shipper. See note 7 Supra. The aim of this provision is to prevent personal favoritism from affecting rates. See Louisville & Nashville R. R. Co. v. Mottley, 219 U.S. 467, 478, 31 S.Ct. 265, 55 L.Ed. 297 (1911); Wight v. United States, 167 U.S. 512, 518, 17 S.Ct. 822, 42 L.Ed. 258 (1897).
 
 
 50
 Section 2 normally requires proof that despite a like kind of traffic moving under substantially similar circumstances, two shippers are being charged different prices. It has been accepted for at least ninety years that proof that a carrier charges shippers less for through goods than for those moving locally does not, without more, establish a violation of section 2. E. g., Union Pac. R. R. Co. v. United States, 117 U.S. 355, 6 S.Ct. 772, 29 L.Ed. 920 (1886); Texas & Pac. Ry. Co. v. ICC, 162 U.S. 197, 16 S.Ct. 666, 40 L.Ed. 940 (1896). Hence, petitioners cannot rest on proof that the joint Explorer-Williams rates are lower than the combination of their local rates.
 
 
 51
 Beyond introducing such clearly insufficient proof, petitioners note that together the bulk of the Gulf Coast shippers served by the Explorer-Williams interconnection Own Explorer. Petitioners attempt to turn this affiliation into a rebate by challenging the division of rates between the two intervenors. They argue that by taking less than its due, Williams has left more to Explorer and to its shipper-owners (through dividends) than is their due, and accordingly has rebated some of the rates that Williams otherwise would have collected. Petitioners support this allegation with evidence allegedly showing that under the Explorer-Williams division of the joint rates Explorer receives the same price for transporting through oil as it does for transporting local oil under its individual rates, while Williams allegedly receives 9.5 cents per barrel less for through oil transported under the joint rates than it does for local oil transported over the same route under its individual rates. Thus, it is argued, Williams bore the full brunt of the " shrinkage" in through rates vis-a-vis the combined local rates, instead of dividing that shrinkage equally with Explorer.
 
 
 52
 Although dicta in Supreme Court cases suggest that divisions of rates between carriers is a matter between themselves, leaving shippers without standing to challenge them before the ICC,[37] there also exist precedents for the view that unequal divisions of rates in situations involving Shipper-owned carriers can result in rebates to the controlling shippers that are illegal under section 2. The Tap Line Cases, 234 U.S. 1, 28-29, 34 S.Ct. 741, 58 L.Ed. 1185 (1914) (dicta); See Divisions Received by Brimstone R. R. & Canal Co., 68 I.C.C. 375, 386-88 (1922), Rev'd on other grounds, Brimstone R. R. & Canal Co. v. United States, 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487 (1928).
 
 
 53
 Unfortunately, petitioners did not discover these latter precedents and mold them into a coherent argument until they filed their reply brief in this court. Reply Brief of Petitioners at 20-22; Cf. Brief of Petitioners, at 44; JA at 1526-32; 3789-95; 1703-08, 1891-92. To the extent that petitioners' somewhat muddled arguments before the ICC implied that Williams' joint rates were "a clear revenue drain" on Williams and thus unreasonably low under section 1(5), JA at 1528, the ICC found otherwise and petitioners have not appealed that finding before us. To the extent that petitioners appeared to be arguing "that the lesser combination rate is, itself, a form of discrimination exercised by" Williams, JA at 1527, they appeared merely to be repeating their argument under section 3(1) that the combination rates were preferential to Gulf Coast shippers and prejudicial to themselves. Hence, while we do not necessarily agree with the administrative law judge that whether "one carrier (public- or shipper-owned) is shortchanged in divisions with another carrier (public- or shipper-owned) is a matter . . . between the carriers (and one that is) foreign to the issue whether the joint rates . . . are discriminatory," we do agree that in This case the issue was not properly raised.[38] Accordingly, the ICC is affirmed on this issue.
 
 
 54
 The case is remanded to FERC for determination by it of whether Williams' rates are reasonable and whether those rates in relation to the combined Williams-Explorer rates create an illegal preference. In other respects, the decision of the ICC is affirmed.
 
 
 55
 It is so ordered.
 
 
 
 *
 Substituted as respondent agency in place of the Interstate Commerce Commission by virtue of Public Law 95-91, § 402(b), 91 Stat. 584 (August 4, 1977) and Executive Order No. 12009, 42 Fed.Reg. 46267 (September 15, 1977)
 
 
 [1]
 The ICC did not approve this sale for the reason that, unlike its regulatory authority with respect to other common carriers such as railroads, its jurisdiction over oil pipelines does not extend to the sale or acquisition of a pipeline company. See 49 U.S.C. § 5(13); p. --- of 189 U.S.App.D.C., 412 of 584 F.2d Infra. Although petitioners do not appear to claim that the price paid was irrational, they do insist that it was subject to the inflationary trend that has recently affected the American economy. The exact relationship of the price to the "fair market value," replacement cost, and reproduction cost of the Great Lakes enterprise is subject to dispute
 
 
 [2]
 In relevant part, 49 U.S.C. § 1(5)(a) provides:
 All charges made for any service rendered or to be rendered in the transportation of . . . property, . . . or in connection therewith, shall be just and reasonable, and every unjust and unreasonable charge for such service or any part thereof is prohibited and declared to be unlawful. . . .
 
 
 [3]
 A valuation rate base allows the carriers to receive a return on the present "fair value" of all of its property devoted to public use. The Interstate Commerce Act, as amended by the Valuation Act, 37 Stat. 701 (1913), gives the ICC broad authority to "investigate, ascertain, and report the value of all property owned or used by" regulated carriers, 49 U.S.C. § 19a(a), based, Inter alia, on "the original cost to date (of public assets), the cost of reproduction new, the cost of reproduction less depreciation, and an analysis of the methods by which these several costs are obtained, and the reason for their differences, if any." Id. § 19a(b). It is generally accepted that in inflationary times the above formula will produce a rate base greater than one derived from "original cost" less depreciation to date of all assets committed to common carrier service, and lower than one derived from the reproduction cost (present cost of reproducing the same physical assets), the replacement cost (present cost of building a like enterprise taking advantage of modern technology), or the going concern value of the business enterprise as it might appear to an arm's-length purchaser
 
 
 [4]
 Petitioners object to Williams' inclusion of two items in the operating expenses for which it is entitled to compensation by way of rate revenues. First, Williams computed its depreciation charges by assuming that its wasting assets had a value equal to the price it paid Great Lakes in 1966 for the purchase of the pipeline, $287.6 million, plus amounts spent since 1966 in adding new physical assets to the system. Petitioners consider this depreciation base excessive both because the purchase price as of 1966 due to inflation is much higher than the sum of the monies actually spent over the years by Great Lakes in putting the physical assets in place, and because that depreciation base allegedly did not account for the fact that Great Lakes had already been compensated for almost $100 million worth of depreciation by way of prior rate revenues. Second, petitioners argue that payments by Williams to two affiliated companies for terminal leases and administrative services were unreasonably excessive, allegedly suggesting intracorporate extravagance that should not be charged to rate payers
 
 
 [5]
 In figuring its tax costs, Williams used the "normalization" method. Under this method, a regulated business accelerates its depreciation schedule for tax purposes, but figures its tax costs for ratemaking purposes as if it were paying the higher taxes required by a straight-line depreciation schedule. The difference between the two amounts is placed in a deferred tax reserve account, out of which the taxes are eventually paid, but on which the business in the meantime collects interest. See 26 U.S.C. § 167(L )(3)(G). Alternatively, Williams could have reflected its present tax savings from accelerated depreciation in lower current costs for ratemaking purposes. This latter method allows current tax savings to "flow through" to current ratepayers, while burdening future ratepayers with the deferred taxes when they come due. Normalization, on the other hand, allows the current benefits and future burdens to be shared more equally by current and future ratepayers. See generally The Second National Natural Gas Rate Cases, No. 76-2000, Et al., slip op. at 29-39 (D.C.Cir. June 16, 1977). Petitioners contend both that the ICC should better explain its deviation from its past insistence on the "flow through" method of computing costs, and that it should take measures to assure that ratepayers will benefit from the interest revenues accruing to Williams' deferred tax account
 
 
 [6]
 In relevant part, 49 U.S.C. § 3(1) provides:
 It shall be unlawful for any common carrier subject to the provisions of this part to make, give, or cause any undue or unreasonable preference or advantage to any particular . . . territory . . . in any respect whatsoever; or to subject any particular . . . territory . . . to any undue or unreasonable prejudice or disadvantage in any respect whatsoever: Provided, however, That this paragraph shall not be construed to apply to discrimination, prejudice, or disadvantage to the traffic of any other carrier of whatever description.
 
 
 [7]
 49 U.S.C. § 2 provides:
 If any common carrier subject to the provisions of this part shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property, subject to the provisions of this part, than it charges, demands, collects, or receives from any other person or persons for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is prohibited and declared to be unlawful.
 
 
 [8]
 Congress passed the Valuation Act at a time when the Supreme Court appeared to require ratemaking to proceed from some type of valuation base. See, e. g., Smyth v. Ames, 169 U.S. 466, 546-47, 18 S.Ct. 418, 42 L.Ed. 819 (1898). The exact components of "fair value" were still "undergoing modification" in the courts as of 1913, however. 49 Cong.Rec. 3796 (1913) (remarks of Sen. La Follette). In putting its gloss on the Smyth doctrine, the ICC wished to include original cost of physical assets as one factor relevant to valuation, but found itself stymied by the railroads' refusal to supply it with the information necessary to determine that cost. Id. at 3795-96. Consequently, Congress enacted the Valuation Act to give the agency the necessary information-gathering ability with respect to original cost, as well as to the more easily determined cost of reproduction new. Id. at 3796. The drafters, however, were decidedly not "prepared . . . to set the boundaries and fix the limits (of ratemaking) absolutely by statute." Id. Their mission was merely to allow the necessary facts "to be secured for the enlightenment of the Commission and the courts." Id
 Once the Supreme Court made clear its willingness to countenance any ratemaking approach that enabled investors to cover operating expenses and capital costs without burdening consumers with exorbitant rates, See, e. g., FPC v. Hope Natural Gas Co., 320 U.S. 591, 603, 64 S.Ct. 281, 88 L.Ed. 333 (1944), even the historical link between ratemaking theory and the valuation-computation authority given ICC by the Valuation Act was broken. After that time, in fact, the apparent endorsement by the Valuation Act's drafters of significant reliance on original cost as a rate base stands as an equally strong indication that past investment rather than present value should predominate in ratemaking methodology. See, e. g., 49 Cong.Rec. 3795 (remarks of Sen. La Follette). The important point, however, is that in passing the Valuation Act, Congress explicitly refused to endorse any ratemaking theory, and, in fact, its complete preoccupation with railroads and its understandable failure to predict the inflationary economy of a half century later make its deliberations on the Act largely irrelevant to oil pipeline ratemaking in the 1970's. Consequently, to the extent that the ICC finds a mandate for "fair value" ratemaking in the Valuation Act, we disagree. See Williams I, supra, 351 I.C.C. at 114. But see Initial Decision, supra, JA at 1605-06.
 
 
 [9]
 The ICC has explained the "dearth of precedent concerning petroleum pipeline rates," Williams II, supra, 355 I.C.C. at 481, as in part a function of the ownership of many of the pipelines by shippers. See Reduced Rates I, supra, 243 I.C.C. at 138-39. Thus, shippers, who generally are the complainants before the ICC in rate cases, are often responsible for, rather than affected by, potentially unreasonable oil pipeline rates. Two of the ICC's four precedents in this area, in fact, derive from nonadversary, ICC-originated investigations. Reduced Rates I, supra ; Reduced Rates II, supra
 Railroad rate-setting another major source of ICC jurisdiction over rates has also presented the agency with limited opportunity for developing post-World War II ratemaking theory, because the general decline of the rail industry has made academic the problem of unreasonably high rates of return. Nonetheless, in this proceeding, the ICC acknowledged that in those railroad ratemaking cases that have considered the issue since the early 1950's, the Commission has abandoned the valuation base, due to the difficulty of determining reproduction cost. Williams I, supra, 351 I.C.C. at 114-15 (discussing Increased Freight Rates, 1951, 297 I.C.C. 17, 25 (1955)). See Net Investment Railroad Rate Base and Rate of Return, 345 I.C.C. 1491, 1514-20, 1604 (1976); Brief for Interstate Commerce Commission, at 13-14. Instead, railroad ratemaking has focused on original cost, present value of land and rights, and working capital needs. See also Increased Rates and Minimum Charges Within, From, and to the South, 335 I.C.C. 77, 97 (1969) (using original cost and rejecting valuation ratemaking for motor carriers).
 
 
 [10]
 To the extent that the Valuation Act encouraged the ICC to use the "fair value" method, it, too, is a product of Smyth v. Ames, and has limited relevance to ratemaking theory since Hope. See note 8 Supra
 
 
 [11]
 See note 3 Supra. For example, in this case, a valuation rate base would require a return on $167.6 million, while an original cost base would require a return on $101.1 million. Williams I, supra, 351 I.C.C. at 108
 
 
 [12]
 The special "hazards" adverted to by the ICC were the pipelines' total dependence on one commodity that flows in only one direction and that must flow in consistently large quantities to be economical, the depletable nature of that commodity, and its exposure to large and unpredictable fluctuations in availability depending upon the discovery of new oil fields. See Petroleum Rail Shippers, supra, 243 I.C.C. at 661; Reduced Rates I, supra, 243 I.C.C. at 122-23. Interestingly, the Commission seemed much more moved by the concern that the opening of new domestic fields would rearrange distribution lines than that domestic oil reserves would in fact be depleted in the near future. See id
 
 
 [13]
 In addition to the general "hazards" of the oil pipeline industry discussed in note 12 Supra, gasoline transmission by pipeline faced special risks of its own. Most importantly, such transmission was in its "initial stages" in the 1940's adequate pipeline technology only recently having been developed and its "speculative" nature prevented financing through bond issues. Petroleum Rail Shippers, supra, 243 I.C.C. at 599-600, 661. Although the ICC never said so explicitly, these special hazards apparently dictated its use of the 2% Higher rate of return for gasoline transmission than crude oil transmission
 It is noteworthy that by 1948, the ICC was no longer willing to accept the "general assertion that rates for pipe-line service should make allowance for the need of (higher) earnings in view of the material hazards of the business." Reduced Rates II, supra, 272 I.C.C. at 381. Nonetheless, having made this observation, the ICC continued to utilize the 8% Rate of return maximum that it developed at a time when it did accept the industry's "higher risks" assertion. Id. at 376, 384.
 
 
 [14]
 See Reduced Rates I, supra, 243 I.C.C. at 138-39
 
 
 [15]
 Id. at 125, 139
 
 
 [16]
 Id. at 130-42. The ICC found it troubling that despite rate reductions in the 1930's caused by pressures from state public utilities commissions and by increased taxes on profits, and despite the depression, the average oil pipeline company under investigation between 1934 and 1938 earned a 14% Rate of return on value and some of those companies earned as high as 45%. Id. at 125, 141-42
 
 
 [17]
 Id. at 129; Reduced Rates II, supra, 272 I.C.C. at 382
 
 
 [18]
 Reduced Rates II, supra, 272 I.C.C. at 377-80
 
 
 [19]
 Reduced Rates I, supra, 243 I.C.C. at 127; Reduced Rates II, supra, 272 I.C.C. at 381
 
 
 [20]
 See Reduced Rates I, supra, 243 I.C.C. at 129; Reduced Rates II, supra, 272 I.C.C. at 381
 
 
 [21]
 In fact, it was FERC (in its previous incarnation as the Federal Power Commission) that, by deviating from "fair value" ratemaking, inspired the Supreme Court's holding that valuation is not the Sine qua non of "just and reasonable" ratemaking. See FPC v. Hope Natural Gas Co., 320 U.S. 591, 601, 64 S.Ct. 281, 88 L.Ed. 333 (1944). In that case, the Commission had used a modified original cost method in determining that the rates charged by a producer-distributor of natural gas were unreasonably high. The Fourth Circuit overturned the Commission's order in part because it felt that the rate base should reflect the valuation of the property. Hope Natural Gas Co. v. FPC, 134 F.2d 287 (4th Cir. 1943). In reversing the Fourth Circuit, the Supreme Court noted that basing rates on present value, which in turn is a function of expected rate revenues, is analytically unsound. 320 U.S. at 601, 64 S.Ct. 281. Without endorsing "any single formula," the Court made clear that it would uphold rates set by any methodology (including one beset by "infirmities") if the "end result" allowed a return on equity "commensurate with returns on investment in other enterprises having corresponding risks," and "sufficient to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital." Id. at 603, 64 S.Ct. at 288
 
 
 [22]
 Pub.L.No.95-91, § 705(c)(2), 91 Stat. 607 (1977). For this reason, a panel of this court denied the motion of FERC to have the case Automatically remanded to it, following the transfer of authority from the ICC. Farmers Union Central Exchange v. FERC, No. 76-2138 (D.C.Cir. Nov. 21, 1977). Section 705(c)(2) required the panel to treat the motion as if it were made by the ICC. And, absent some special showing of "legal blemish" or of a supervening change in the law, a "significant change in conditions or newly-discovered evidence" we are generally reluctant to remand an agency's decision to it for reconsideration after the statutory time for agency reconsideration has passed and a petition for review has been filed with us. Greater Boston Television Corp. v. FCC, 149 U.S.App.D.C. 322, 344, 463 F.2d 268, 290 (1971); See NLRB v. Food Store Employees Union, Local 347, 417 U.S. 1, 10 n. 10, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974); Braniff Airways, Inc. v. CAB, 126 U.S.App.D.C. 399, 379 F.2d 453 (D.C.Cir. 1967). In such cases, it is recognized that the winning party has an interest in the opportunity to defend the agency's original determination
 This rule, however, does not apply where, as here, the winning party below (joined, in fact, by one of the agencies involved) Has had the opportunity to defend the agency's decision before us, See note 23 Infra, and where that defense has not removed apparent "legal blemish(es)" in that decision that have surfaced during our consideration.
 
 
 [23]
 In unsuccessfully seeking remand before oral argument, See note 22 Supra, FERC refused to take a position in this case. Accordingly, the Court approved the ICC's filing of a brief in support of its decision, and ordered it to participate in oral argument on the merits. Farmers Union Central Exchange v. FERC, No. 76-2138 (D.C.Cir. April 5, 1978)
 
 
 [24]
 Although the first, it almost assuredly is not the last in light of the dramatic recent expansion in this nation's reliance on oil pipeline transmission. See Mobil Alaska Pipeline Co. v. United States, 557 F.2d 775 (5th Cir.), Aff'd sub nom. Trans Alaska Pipeline Rate Cases, 436 U.S. 631, 98 S.Ct. 2053, 56 L.Ed.2d 591 (1978) (involving preliminary questions of ICC's authority to set Initial rates for the Trans Alaska pipeline)
 
 
 [25]
 Although the full ICC eventually passed on petitioners' claims, its opinion (Williams II ) essentially supplements the opinion of a three-commissioner division of the agency (Williams I ) which, in turn, adopts the findings of the administrative law judge's Initial Decision. See Williams, II, supra, 355 I.C.C. at 482; Williams I, supra, 351 I.C.C. at 126. Hence, all three opinions will be examined herein
 
 
 [26]
 See Williams I, supra, 351 I.C.C. at 111. See also Williams Bros. Pipe Line Co., 338 I.C.C. 549 (1970) (most recent published valuation by ICC of Williams)
 Other factors considered in the ICC's complex valuation formula include reproduction cost new minus depreciation, going concern value, present value of land and rights-of-way, and working capital. See Williams I, supra, 351 I.C.C. at 111-12. See generally note 3 Supra.
 
 
 [27]
 See Initial Decision, JA at 1609; Williams I, supra, 351 I.C.C. at 105; Williams II, supra, 355 I.C.C. at 483-84
 Reference was made by the administrative law judge to the "end result" doctrine of FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944), See notes 8 & 21 Supra. See JA at 1606-08. Nonetheless, having attempted to show that an original cost base might impair Williams' financial integrity a concern reflected in Hope he failed to discuss what "returns (characterize) investments in other enterprises having corresponding risks," and whether Williams' rates allow returns "commensurate" therewith. 320 U.S. at 603, 64 S.Ct. at 288; See JA at 1607-08. Nor did his mention of Williams' contention, JA at 76, 2622, that a 14% Return on equity is "necessary and . . . fair," serve this purpose, because He made no such finding to that effect, nor did he find that the rates actually allowed that, or any other return (the only relevant testimony, not relied upon, showed an actual return on equity of between 10.9 and 12.5%), nor did he rely in any way on the 14% Figure. Id. at 1608, 1609. Even more telling, neither the three-commissioner division nor the full Commission paid even this exiguous attention to Hope or to the actual cost of equity capital to Williams. See Williams I, supra, 351 I.C.C. at 114.
 See Southwestern Bell Tel. Co. v. Missouri Pub. Serv. Comm'n, 262 U.S. 276, 289-312, 43 S.Ct. 544, 67 L.Ed. 981 (1923) (Brandeis, J., concurring), for the classic critique of the fair value rate base, characterizing that methodology as "vicious(ly) circ(ular)" from an analytical standpoint, difficult to administer given the vagaries of determining reproduction or replacement cost, and likely to impair capital or produce windfall profits in, respectively, deflationary or inflationary times. See also FPC v. Hope Natural Gas Co., supra, 320 U.S. at 601, 64 S.Ct. 281.
 
 
 [28]
 See note 35 Infra. Of similar effect is the ICC's argument that the valuation method is so well established that it may only be revised by way of a rulemaking proceeding in which all interested parties may take part. Initial Decision, supra, at 1605; Williams I, supra, 351 I.C.C. at 112-13, Williams II, supra, 355 I.C.C. at 484. Although the agency's premise that the valuation method is well-established may be doubtful, we do not question the agency's discretion to choose between adjudicatory or quasi-legislative means of adopting a new methodology for the future. Nonetheless, petitioners have challenged Williams' past rates as unreasonable, and section 1(5)(a) of the Interstate Commerce Act states that no unreasonable rate may stand. The ICC could have, but did not, hold this case in abeyance pending completion of a broad rulemaking proceeding that it had initiated to review its oil pipeline ratemaking theory. See Ex Parte No. 308, Valuation of Common Carrier Pipelines (order served Jan. 9, 1977), Transferred to FERC, 42 Fed.Reg. 55534 (1977). Instead, it adjudged Williams' rates to be reasonable, based in part upon a "fair value" rate base. It is accordingly of no solace to petitioners or to us in reviewing their petition that at some time in the future, the Commission (or its successor) may, by rulemaking, adopt a wholly different approach
 
 
 [29]
 See Initial Decision, supra, JA at 1607, 1608; Williams I, supra, 351 I.C.C. at 111, 117. The degree to which the ICC's valuation rate base responds to inflation is a matter of doubt. The administrative law judge opined that it "only partially reflects inflation since it considers both the original cost to the first investor and the reproduction cost new, not just the latter." Initial Decision, Supra, JA at 1607. Nonetheless, by including the cost of reproduction new rather than that of replacement, See Williams I, supra, 351 I.C.C. at 109-10, 111; note 8 Supra, the valuation formula is weighted rather heavily toward inflation. That is to say, since reproduction new reflects the higher prices characteristic of modern materials, without also reflecting the efficiencies of modern technology as would replacement cost it overemphasizes inflation's effect on the hypothetical cost of reconstructing the plant
 
 
 [30]
 See Williams I, supra, 351 I.C.C. at 105-06; Williams II, supra, 355 I.C.C. at 483, 487. The Commission found that Williams' rates produced rates of return (on valuation) of between 8 and 9%
 
 
 [31]
 For example, the Commission in the 1940's held the line for crude oil transmission companies at an 8% Rate of return, but allowed gasoline carriers to receive 10%. The only discernible reason for the disparity was the infancy of the gasoline transmission industry. See note 13 Supra. This special "hazard" having presumably matured out of the picture over the last three decades, we might well have expected the 8% Ceiling to be applied to gasoline as well as crude oil carriers in which case Williams' rate of return would be excessive. See note 30 Supra. Nonetheless, no explanation is forthcoming from the ICC for its continued reliance on the 10% Figure, despite the absence of an important factor used in the ascertainment thereof
 This is not to imply that we think an 8 or 10% Rate of return is necessarily excessive. Such modern "hazards" as inflation and the uncertain availability of foreign oil, as well as special risks facing Williams, See JA at 184-90, 2575-81, may well warrant the opposite conclusion. Our point is simply that the ICC's criterion for reasonableness blind adherence to 1940's standards is unconvincing.
 
 
 [32]
 A major determinant of ICC's reporting rules were "accepted accounting practices." Uniform System of Accounts, supra, 337 I.C.C. at 522
 
 
 [33]
 See Permian Basin Area Rate Cases, 390 U.S. 747, 790, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). For this reason, we do not find it necessary to address petitioners' further challenges based on Williams' tax treatment and computation of certain operation expenses. See notes 4 & 5 Supra
 
 
 [34]
 That is, seeking remand for reconsideration
 
 
 [35]
 See, e. g., Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Ry. Co., 284 U.S. 370, 385, 389, 52 S.Ct. 183, 76 L.Ed. 348 (1932); Moss v. CAB, 139 U.S.App.D.C. 150, 154-55, 430 F.2d 891, 895-96 & n. 24 (1970); cases discussed in Id. at 156-58, 430 F.2d at 897-99 nn. 29-33
 The exact confines of this rule need not be explored herein. Accordingly, we need not decide now whether the rule might also protect Williams from reparations for the period from 1972 until the issuance of this decision. That possibility arises because, as the ICC recognized, See text accompanying note 29 Supra, Williams' actions in this case have partaken (to an unspecified degree) of a justifiable reliance on ICC precedents from the 1940's, and especially on language in its 1971 Uniform System of Accounts order that support a valuation rate base, an 8-10% Rate of return, and a purchase-price depreciation basis. Although these sources may embody questionable notions about ratemaking, they do represent the expectations of the ICC concerning future rate activity and, as such, may be seen as binding on a regulatee within the ICC's authority until they are publicly revised. Cf. Atlantic Coast Line R. R. Co. v. Florida, 295 U.S. 301, 311-12, 55 S.Ct. 713, 79 L.Ed. 1451 (1935).
 
 
 [36]
 In addition to examining this issue in light of whatever new evidence it develops, FERC should pay special attention to three questions that appear to us to be central to the § 3(1) determination. First, is the ICC correct in assuming that even if a disparity between local and through rates exists and destroys some of petitioners' geographical advantage over the Gulf Coast shippers, petitioners' partial retention of that advantage forestalls any finding of competitive injury? Williams I, supra, 351 I.C.C. at 119-20. Is that assumption correct even if the advantage retained is solely one in transportation costs but not one in net drilling-plus-refining-plus-transportation costs I. e., even if, overall, petitioners' products end up costing more than those originating in the Gulf Coast area? Cf. A. Lindberg & Sons, Inc. v. United States, 408 F.Supp. 1032, 1037-38 (W.D.Mich.1976); Chicago & E. Ill. R. R. Co. v. United States, supra, 384 F.Supp. at 301 (both cases suggesting that Any showing of (a) actual competition between the parties subject to the rate disparity, and of (b) some effect on that competitive situation caused by the disparity, will suffice). Second, does petitioners' showing that the ratio of rates to cost for transporting local products under the local rates was much higher than that same ratio for through products under the joint rates belie the existence of "transportation conditions" that justify the disparity between local and through rates? Finally, does the decision in Texas & Pac. Ry. v. United States, 289 U.S. 627, 649-55, 53 S.Ct. 768, 77 L.Ed. 1410 (1933), protect Williams and Explorer from liability in this case because of their inability to control the other's rates? Cf. Ayrshire Collieries Corp. v. United States, 335 U.S. 573, 69 S.Ct. 278, 93 L.Ed. 243 (1949); New York v. United States, 331 U.S. 284, 67 S.Ct. 1207, 91 L.Ed. 1492 (1947)
 
 
 [37]
 Great No. Ry. Co. v. Sullivan, 294 U.S. 458, 463, 55 S.Ct. 216, 79 L.Ed. 654 (1935); Louisville & Nashville R. R. Co. v. Sloss-Sheffield Steel & Iron Co., 269 U.S. 217, 234, 46 S.Ct. 73, 70 L.Ed. 242 (1925)
 
 
 [38]
 Initial Decision, supra, JA at 1594; See id. at 1592-94; 1605. In the two Supreme Court precedents relied upon by the administrative law judge for the proposition that "division of a joint rate is a matter of no concern to a shipper," Id. at 1592; See note 37 Supra, no shipper-owned carrier was involved. In both cases, shippers challenged joint rates as unreasonable under § 1, and the division of the rates had no impact on their overall reasonableness, as the Court noted in both cases. Great No. Ry. Co. v. Sullivan, supra, 294 U.S. at 463, 55 S.Ct. 216; Louisville & Nashville R. R. Co. v. Sloss-Sheffield Steel & Iron Co., supra, 269 U.S. at 234, 46 S.Ct. 73. Hence, they do not appear to disapprove of the dicta in The Tap Line Cases, supra, 234 U.S. at 28-29, 34 S.Ct. 741, suggesting that, in a case under § 2 in which shipper ownership of a carrier is relevant to the existence of discrimination, the division of joint rates may be a matter of importance to the allegedly injured shippers. The ICC, in fact, has allowed a shipper to intervene in a division-of-rates case on precisely this theory. Divisions Received by Brimstone R. R. & Canal Co., 68 I.C.C. 375, 376 (1922), Rev'd on other grounds, Brimstone R. R. & Canal Co. v. United States, 276 U.S. 104, 48 S.Ct. 282, 72 L.Ed. 487 (1928). See id. at 386, Citing The Tap Line Cases, supra
 In reviewing the ICC's Brimstone decision, however, the Supreme Court did conclude that the ICC had no authority to order the retrospective redivision of joint rates; the Commission's authority with respect to rate divisions, derived from 49 U.S.C. § 15(6)(a), As amended, Pub.L. 94-210, § 201, 90 Stat. 34 (1976), is entirely prospective. Brimstone R. R. Co. v. United States, 276 U.S. 104, 121-23, 48 S.Ct. 282, 72 L.Ed. 487 (1928); See Baltimore & Ohio R. R. Co. v. Alabama Great So. R. R. Co., 165 U.S.App.D.C. 226, 506 F.2d 1265, 1268-69 (1974). Consequently, by affirming the Commission on the ground that petitioners failed properly to raise this issue before the ICC, we have not foreclosed them from raising it again before the ICC's successor (FERC) and from receiving precisely the prospective redress to which they would potentially be entitled were we instead to remand. Williams, of course, would be free at that time to interpose the defense that whatever special treatment was accorded Explorer's owners was required by the need to meet competition from Explorer and other carriers. See, e. g., McGraw Elec. Co. v. United States, 120 F.Supp. 354, 361-62 (E.D.Mo.) (three-judge court), Aff'd mem., 348 U.S. 804, 75 S.Ct. 45, 99 L.Ed. 635 (1954); JA at 1888, 2574.